710 So.2d 1276 (1996)
Jason Oric WILLIAMS
v.
STATE.
CR-92-0382.
Court of Criminal Appeals of Alabama.
August 23, 1996.
Opinion Overruling Rehearing November 1, 1996.
*1290 Paul Brown, Mobile; Richard Yelverton, Mobile; and Bernard E. Harcourt, Cambridge, Massachusetts, for appellant.
Jeff Sessions and Bill Pryor, attys. gen., and Beth Hughes, asst. atty. gen., for appellee.
PATTERSON, Judge.
The Mobile County grand jury returned four separate indictments (CC-92-1552, CC-92-1553, CC-92-1554, and CC-92-1555) against the appellant, Jason Oric Williams, on April 21, 1992. In case CC-92-1552, he was charged with and convicted of the capital offenses of killing two persons during a robbery in the first degree or an attempt thereof, a violation of § 13A-5-40(a)(2), Code of Alabama 1975.[1] In case CC-92-1553, he was charged with and convicted of the capital offenses of murders wherein two or more persons are murdered by one act or pursuant to one scheme or course of conduct, a violation of § 13A-5-40(a)(10).[2] In case CC-92-1554, he was charged with and convicted of the offense of attempted murder of Jeffery Carr, a violation of § 13A-4-2 and § 13A-6-2.[3] In case CC-92-1555, he was charged with and convicted of the offense of attempted murder of Brad Barber, also a violation of § 13A-4-2 and § 13A-6-2.[4] On motion of the state, the offenses charged in the four indictments were consolidated for trial.
In reference to the convictions for the capital offenses (CC-92-1552 and CC-92-1553), a sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, and the jury recommended, by a vote of 10 to 2, that the sentence be death.[5] The trial court held another sentencing hearing in accordance with §§ 13A-5-47 through -52, and, after considering all the evidence, after weighing the aggravating and mitigating circumstances, and after considering the presentence report and the jury's recommendation, the trial court sentenced the appellant to death. In reference to the convictions for attempted murder (CC-92-1554 and CC-92-1555), the trial court sentenced the appellant to 20 years' imprisonment in each case, taxed the costs of court against him, ordered him to pay $50 to the victims compensation fund in each case, and ordered him to reimburse the state $1,500 for attorney's fees.
The state's evidence shows that the appellant had been living in the home of Gerald and Clair Paravicini in Irvington, for approximately *1291 two weeks before February 15, 1992, the date the crimes were committed. Before that, he had lived with his former wife, Sandra Ellzey, but she had forced him to move. The Paravicinis, whom the appellant had known for several years, had allowed the appellant to move into their home because he had no place to live. Jeffery Carr, the minor son of Mrs. Paravicini, also lived in the home. The appellant spent the evening of February 14 and the early morning hours of February 15, 1992, drinking alcohol and taking drugs. Around 6:00 a.m. on February 15, he arrived at the Paravicini home and was admitted by Jeffery Carr after knocking on a window. He called Ellzey on a portable telephone and while they were arguing, obtained Mr. Paravicini's.22 caliber automatic rifle and some hollow-point bullets from a bedroom. He then shot Jeffery Carr in the face and, as Mr. Paravicini came to Jeffery's aid, he shot Mr. Paravicini in the chest and neck. Jeffery ran out of the house to seek help, and Mr. Paravicini ran into the street, where he died. The appellant demanded the keys to the Paravicinis' automobile from Mrs. Paravicini and when she did not produce them, he struck her in the face with the rifle, breaking her jaw and two teeth, and he threatened to kill her. He took her purse, which contained her checkbook, credit cards, and $530 cash, and ran to the road where he attempted to commandeer a passing truck driven by Buford Billedeaua.[*] Billedeaua stopped his truck, but then took the keys and fled into the nearby woods as the appellant fired two shots at him. The appellant then went to the nearby home of Linda and Fred Barber. The Barbers had two sons, Bryan and Brad, who lived with them and who were present in the home at the time. When Mrs. Barber opened the door, the appellant shot her, without warning, in the face and head, killing her instantly. He then shot Mr. Barber, who was sitting in the kitchen drinking coffee, twice in the head, killing him instantly. He then shot Bryan, who was asleep in his bed, twice in the head, killing him. Brad locked himself in a bedroom, but the appellant kicked the door in and while he and Brad were struggling over the rifle, Brad was shot in the left hand. Brad broke free and fled while the appellant continued to fire at him.
The appellant took the Barbers' vehicle, a Ford Aerostar van, along with Mr. Barber's wallet, which contained approximately $50, and Mrs. Barber's purse. He was apprehended the following day in Mississippi after he telephoned Ellzey. When he was apprehended, he was in possession of the Barbers' vehicle, in which were found .22 caliber bullets. After being properly advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), he was questioned about Mr. Paravicini's rifle, and he stated that he threw the rifle off a bridge into the water as he entered Mississippi. The rifle was never recovered.
The appellant presented the defense of insanity, he alleged, caused by severe drug abuse coupled with a preexisting mental disorder.[6] The state contended that *1292 the appellant became angry after having an argument with his former wife and that he went on a shooting spree. The appellant states in his brief, "The only issue in the case was whether Jason Williams acted out of insane, drug-induced delusions and hallucinations, or whether he was just angry at his ex-wife and acted out of rage."
The appellant testified in his defense that he did not remember anything about the incident from the time he telephoned Ellzey from the Paravicini home until he realized that he was in Mississippi in a strange vehicle with a rifle and with blood on his body. However, on cross-examination, he claimed that he was hallucinating at the time of the shootings: he thought he was being attacked by a "large apparition." In addition to presenting four witnesses who testified that the appellant had been drinking alcohol and taking drugs on the night before the shootings, he testified that he had been drinking alcohol and taking drugs during the hours preceding the shootings. He also presented the testimony of a psychiatrist that he was "psychotic" on the morning of the shootings because of an "emotional illness," which the psychiatrist defined as a "borderline personality disorder," coupled with heavy usage of alcohol and drugs the night before. The psychiatrist concluded that as a result, at the time of the shootings, the appellant was suffering from a mental disease or defect that rendered him unable to appreciate the nature and quality or wrongfulness of his acts.
In rebuttal, the state presented the testimony of a forensic psychologist who contradicted the testimony of the appellant's expert, concluding that even though the appellant may have been intoxicated at the time of the killings, he had the ability to appreciate what he was doing, he understood what he was doing, and he realized the wrongfulness of his acts.
At the sentencing hearing before the jury, the appellant presented evidence that he was the product a dysfunctional home. His mother testified that his father had abandoned him when he was seven years old and that he had been adopted by her sister. His former wife, Ellzey, testified that the appellant had some "good" in him and that, when they were married, he was good to her and her son. The appellant testified at the sentencing hearing before the jury that he did not remember what had happened and that he was sorry. He presented a written statement to the same effect at the sentencing hearing before the trial court.
The appellant does not contest the facts showing that he fired the shots that killed Gerald Paravicini and the Barbers and that wounded Brad Barber and Jeffery Carr, and he does not contest the fact that he took the Barbers' automobile. He does question the state's interpretation of these facts. He contends that the evidence was insufficient to support a verdict finding him guilty of the capital offense of murder committed during a robbery in the first degree because, he argues, the killing of the Barbers was a random actnot done in the course of committing a theft of the Ford Aerostar van. In other words, he contends that taking the van was an afterthought to the murders. He also contends that the evidence was insufficient to support the verdict finding him guilty of the capital offense of murder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct because, he alleges, the murders of Mr. Paravicini, Mr. Barber, Mrs. Barber, and Bryan Barber were separate random killings and were not the result of one continuous act or committed pursuant to one scheme or course of conduct. The appellant also contends that it was error to convict him of the crimes charged in the indictments because at the time of the commission of the acts constituting the offenses, he, because he was suffering from a severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts.
*1293 The appellant appeals his convictions and sentences, raising a host of issues. We will address those issues in the order that they appear in the appellant's brief. In addition, we have searched the record for plain error as required by Ala.R.App.P. 45A.[7]

I.
The appellant contends that the prosecuting attorney abused the grand jury process by summoning and questioning his "principal defense witness," his former wife Ellzey, before the grand jury in May after he had already been indicted in April. He argues that the prosecuting attorney used the grand jury for discovery purposes and to obtain impeachment material to be used at trial. He argues that he was denied due process of law because the prosecutor "used the fruits of the grand jury abuse to discredit and impeach the lead defense witness in a manner that was highly prejudicial to the defendant." He asks us to grant him a new trial and to prohibit the state from using the "fruits of the grand jury abuse" to impeach his witness Ellzey at this new trial.
In reviewing this argument, we first note that the appellant did not raise this issue during the course of the trial; it was brought to the trial court's attention only during the hearing on the appellant's motion for a new trial. The grounds urged for a new trial must ordinarily be preserved at trial by timely and adequate objections. Smith v. State, 393 So.2d 529, 532 (Ala.Cr. App.1981); Fuller v. State, 365 So.2d 1010 (Ala.Cr.App.1978), cert. denied, 365 So.2d 1013 (Ala.1979).
"[A] new trial will not be granted for matters pertaining to rulings, evidence, or occurrences at a trial, including erroneous conduct on the part of the court, counsel, or jury, unless timely and sufficient objections, requests, motions, or exceptions have been made and taken. Any grounds which might have been afforded by such matters are presumed to have been waived, except where such matters were unknown to applicant until after verdict and could not have been discovered by the exercise of reasonable diligence, and except in instances of fundamental errors which of themselves invalidate the trial."
Fuller v. State, 365 So.2d at 1012 (quoting 24 C.J.S. Criminal Law § 1428 (1961)).
This case does not fall within the noted exceptions: where matters are unknown to the appellant and could not have been discovered by reasonable diligence until after the verdict or where fundamental error itself invalidated the trial. It is reasonable to conclude that defense counsel knew before the trial began that Ellzey had been summoned before the grand jury and questioned after the appellant had been indicted. At the very latest, defense counsel knew before she testified at trial that she had appeared before the grand jury. (This conclusion is illustrated by defense counsel's question to Ellzey on direct examination, "Sandy [Ellzey] have you also testifiedbasically whatever testimony you gave todayto a grand jury here in Mobile County?") Immediately after the prosecutor used the transcript of Ellzey's grand jury testimony during cross-examination in his attempt to impeach her and/or to refresh her recollection, a transcript of her grand jury testimony was delivered to the appellant and his counsel. (The transcript of Ellzey's testimony before the May grand jury is in the record before us.) Defense counsel was given time to review the transcript before its redirect examination of the witness. Defense counsel certainly could *1294 have brought any alleged potential abuse of the grand jury process to the attention of the trial court before trial or at least during the course of the trial, but did not do so. To preserve the issue for appellate review, counsel should have objected at trial to the admission of any evidence allegedly derived from grand jury misuse or to the prosecutor's use of such grand jury testimony. The issue was not preserved for our review. Under the circumstances here, the trial court's denial of the motion for a new trial on this ground was proper.
Even though this issue was not preserved for review by timely objection, because this is a capital case, we must review it under the plain error rule. The law is settled that "once a defendant has been indicted, the government is precluded from using the grand jury for the `sole or dominant purpose' of obtaining additional evidence against him." United States v. Thompson, 944 F.2d 1331, 1337 (7th Cir.1991), cert. denied, 502 U.S. 1097, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992) (quoting United States v. Moss, 756 F.2d 329, 332 (4th Cir.1985)). "[I]t is improper to utilize a grand jury for the sole or dominating purpose of preparing an already pending indictment for trial." In re Grand Jury Subpoena Duces Tecum Dated January 2, 1985 (Robert M. Simels, Esq.), 767 F.2d 26, 29 (2d Cir.1985) (quoting United States v. Dardi, 330 F.2d 316, 336 (2d Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964)). See 8 J. Moore, Moore's Federal Practice, § 6.04[5] at 6-86 (1984).
"`[The grand jury] is that branch of the court, when organized under the statute, in which all criminal prosecutions by indictment must originate. It puts in motion the organized machinery for the trial of persons charged with crime by presenting in open court in the name of the State a complaint, which must be endorsed a true bill. By this means the court acquires jurisdiction of the particular case. The functions and powers of the grand jury as to the indictment so returned are ended when the presentment is made and the indictment or true bill is received by the court.'"
Committee Comments, Ala.R.Cr.P. 12.3, quoting Fields v. State, 121 Ala. 16, 17, 25 So. 726, 727 (1899).
"The grand jury is given its broad investigative powers to determine whether a crime has been committed and an indictment should issue, not to gather evidence for use in cases in which indictments have already issued. Accordingly, both state and federal courts hold that it is an abuse of the grand jury process to use grand jury subpoenas `for the sole or dominating purpose of preparing an already pending indictment for trial.' Those courts also hold, however, that where the primary purpose of the investigation is to determine whether others not indicted were involved in the same criminal activity, or whether the indicted party committed still other crimes, the government may go forward with the inquiry even though one result may be the production of evidence that could then be used at the trial of the pending indictment.
"A claim of a dominant purpose of post-indictment discovery may be raised in various procedural settings, including a witness' motion to quash a subpoena, an indicted target's motion for a protective order restricting the scope of an investigation, and a defense objection at trial to the admission of evidence arguably derived from such grand jury misuse. In evaluating such claims, the general approach of the courts has paralleled that applied to claims of the misuse of a grand jury to obtain civil discovery. Courts have commonly noted that a `presumption of regularity' attaches to the grand jury proceeding and that the objecting party bears the burden of overcoming that presumption. Courts have also noted their reluctance to interfere with an ongoing investigation, suggesting that the true purpose of the investigation can best be assessed after it is completed. Where the objecting party can point to surrounding circumstances highly suggestive of improper use, the court may require a governmental affidavit explaining the purpose of the investigation or it may examine the grand jury transcript in camera to determine *1295 that purpose. Successful challenges are rare, but they do occur."
W. LaFave and J. Israel, Criminal Procedure § 8.8(d) (1984) (footnotes omitted).
The record supports the argument that the dominant purpose of Ellzey's grand jury testimony was not post-indictment discovery, but rather investigation into whether the appellant had committed other crimes, i.e., the attempted murders of Clair Paravicini and Buford Billedeaua. The prosecutor first presented evidence of the crimes charged in this case to the April 1992 Mobile County grand jury. That grand jury returned the four indictments referred to above, pursuant to which the appellant was tried, but it did not return indictments on the charges of attempted murder of Clair Paravicini and Buford Billedeaua. These charges were carried over and placed on the docket of the grand jury that convened in May. In May, after the grand jury's return of the indictments but before trial, the prosecutor summoned Ellzey to appear before the grand jury, where he questioned her at length concerning her knowledge of the crimes. She had not been called to testify before the April grand jury. While the prosecutor did state that he called Ellzey before the grand jury to get her sworn statement, he also stated that he called her for the purpose of continuing the investigation of attempted murder charges against the appellant involving Clair Paravicini and Buford Billedeaua. Further support for the argument that post-conviction discovery was not the prosecutor's sole or dominant purpose in summonsing Ellzey before the May grand jury is the fact that the prosecutor already had Ellzey's extrajudicial statement for purposes of discovery or to possibly use as impeachment. (This statement was a detailed statement of her knowledge of the crimes given a few hours after the crimes had occurred.) Considering that the investigation of charges pertaining to Clair Paravicini and Buford Billedeaua was properly pending before the May grand jury, considering the statement given the investigators by Ellzey shortly after the crimes were committed and that that statement contained substantially the same information that Ellzey gave the grand jury, and considering the statement of the prosecutor that he called Ellzey before the grand jury partly to further explore the possibilities of indicting the appellant for the attempted murder of Clair Paravicini and Buford Billedeaua, we cannot conclude, as the appellant urges us to do, that the sole or dominating purpose of the prosecutor was to prepare the already pending indictments for trial. We find no abuse of the grand jury process from this record.
Even assuming for the sake of argument that the circumstances before us suggest the prosecutor's improper use of the grand jury, any abuse does not rise to the level of reversible error. The record before us does not show that the prosecutor gained any benefit from Ellzey's grand jury testimony. Her grand jury testimony was essentially and substantially the same as her testimony at trial; it offered no significant value for impeachment or for refreshing Ellzey's recollection. Moreover, as we have noted, it conveyed no additional information to that contained in her extrajudicial statement. Thus, her grand jury testimony had no real discovery value.
In conclusion, we reject the appellant's contentions that the use of the grand jury testimony of Ellzey for impeachment purposes was highly prejudicial and that it took him by surprise. The appellant's contention that the prosecutor's use of Ellzey's grand jury testimony for impeachment was highly prejudicial is not supported by the record. The record also fails to support the appellant's argument that he was surprised. Rather it shows, as we have already discussed, that prior to Ellzey's testimony at trial the appellant knew of her appearance before the grand jury. Moreover, he had been furnished a copy before trial of Ellzey's extrajudicial statement, which, as we have pointed out, contained substantially the same information Ellzey gave to the grand jury; therefore, he was prepared to defend against the facts contained in Ellzey's statement. We find that any benefit gained from having Ellzey give, under oath, her rendition of her knowledge of the circumstances surrounding the crimes, as opposed to her extrajudicial statement, is so slight under the facts before *1296 us as to be insignificant. Thus, we find no plain error in the prosecutor's calling of Ellzey before the grand jury or in the manner of the prosecutor's use of her grand jury testimony. Neither adversely affected a substantial right of the appellant or suggested any impropriety so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. In so holding, however, we caution that a prosecutor's post-indictment use of a grand jury is a very serious matter to be undertaken only under strict adherence to the pertinent law. We further note that, when a prosecutor must resort to such a practice, the prosecutor should make certain that the record reflects the circumstances necessitating such use of a grand jury.

II.
The appellant contends that his convictions should be reversed because, he says, the state withheld exculpatory evidence from him in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He argues that he was denied due process of law when the state did not produce the transcript of the May 18, 1992, grand jury testimony of defense witness Ellzey until after she had been questioned by defense counsel on direct examination and cross-examined by the prosecution. The appellant filed pretrial motions seeking the disclosure of any exculpatory and mitigating evidence. He particularly sought information that would help establish his insanity defense and would bear on matters of mitigation. He specifically requested "any information regarding irrational or delusional behavior in the 24-hour period immediately preceding the killings." He did not specifically request any grand jury testimony. The trial court granted the motions. At the hearing on the motions, the prosecutor represented to the trial court and to the appellant that he would open his files for discovery, with the exception of "grand jury materials." Pursuant to the trial court's order, it was understood by the parties that the grand jury testimony would not be disclosed unless it contained material that would be exculpatory. While the appellant did not specifically request Ellzey's grand jury testimony in his pretrial discovery motion, we construe the appellant's requests and the trial court's corresponding order as sufficient to have put the state on notice to produce all Brady material, i.e., all exculpatory and impeachment information in its possession, including any such information in the transcripts of grand jury testimony.
In Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." A Brady violation occurs where: (1) the prosecution suppresses evidence; (2) the evidence is favorable to the defendant and (3) material to the issues at trial. Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990); Delap v. Dugger, 890 F.2d 285 (11th Cir. 1989); United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir.), cert. denied, 464 U.S. 914, 104 S.Ct. 275, 276, 78 L.Ed.2d 256 (1983); Ex parte Kennedy, 472 So.2d 1106, 1110 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). The Supreme Court of the United States in United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (plurality opinion by Blackmun, J.), defined the standard of materiality required to show a Brady violation as follows: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." See also Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); Stano v. Dugger, 901 F.2d at 899; Delap v. Dugger, 890 F.2d at 299; Coral v. State, 628 So.2d 954 (Ala.Cr. App.1992); Thompson v. State, 581 So.2d 1216 (Ala.Cr.App.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
The same standard of materiality and due process requirements apply whether the evidence is exculpatory or for impeachment purposes. United States v. Bagley; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Ex parte *1297 Womack. "When the `reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within the general rule." Giglio, 405 U.S. at 154, 92 S.Ct. at 766 (quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). In short, due process requires the prosecution to disclose material evidence, upon request by the defense, when that evidence would tend to exculpate the accused or to impeach the veracity of a critical state's witness.
After reviewing Ellzey's grand jury testimony, we conclude, contrary to the appellant's assertions, that it was not favorable to the appellant. In our opinion, it did not contain exculpatory or impeachment evidence. We further find that while a transcript of Ellzey's grand jury testimony may have been useful to defense counsel in preparing his direct examination, Ellzey's grand jury testimony did not meet the materiality standard. Because it was substantially the same as her testimony at trial, and because it covered essentially the same information contained in a written statement given by Ellzey shortly after the crimes were committed and furnished to the appellant prior to trial, there is no reasonable probability that the results of the trial would have been different had the appellant been furnished a transcript prior to Ellzey's cross-examination. The failure of the prosecutor to deliver to the defense a transcript of Ellzey's grand jury testimony before defense counsel's redirect examination of her did not violate the appellant's due process rights. We find no Brady violation.

III.
The appellant requests that we remand this case to the trial court with instructions that he be furnished a transcript of the April 1992 Mobile County grand jury proceedings relating to his case, and that the record on appeal be supplemented by the addition of a copy of those proceedings. He argues that a copy of the proceedings would help us determine (1) the issue raised in part I, supra, i.e., whether the prosecuting attorney abused the grand jury process, and (2) the issue raised in part II, supra, i.e., whether the tardy disclosure of Ellzey's grand jury testimony violated Brady v. Maryland.
The appellant sought a copy of the April grand jury proceedings and sought to have the record on appeal supplemented with a copy of those proceedings for the first time during the hearing on his motion for a new trial. The record shows that the trial court denied the appellant's requests.
Rule 10(g), Ala.R.App.P., does not permit the appellant to present on appeal matters that were not initially presented in the trial court. See Anderson v. State, 641 So.2d 1299 (Ala.Cr.App.), cert. denied, 641 So.2d 1299 (Ala.Cr.App.1994). The rule allows the record on appeal to be supplemented, but only to include matters that were in evidence at the trial level and that were inadvertently omitted from the record on appeal. Richburg v. Cromwell, 428 So.2d 621 (Ala.1983). The trial court properly denied the appellant's motion to supplement the record on appeal with a copy of the April grand jury proceedings.

IV.
The appellant contends that the trial court erred by overruling his objection to the prosecution's question on cross-examination of Ellzey, asking about a statement she had made to the investigators of the Mobile County Sheriff's Department on the morning after the crimes had been committed. The record shows the following:
"Q. [prosecutor]: Did you say this to Detective McRae? `I am from this area. When I met Jay [the appellant], to me, [Irvington] is the cesspool of Mobile County down there. You know, I hate this place. Ever since I have known Jay, I have tried to get him out of this neighborhood and keep him away from this because nothing but shit just brews down here.' Did you say that?
"A. [Ellzey]: Yes, I did."
The record further shows that this question and answer was not specifically objected to. Thus, we examine this issue under the plain error doctrine. Irvington is where the victims lived and where the crimes occurred. The appellant argues that this statement was *1298 irrelevant and highly prejudicial, and that its introduction into the trial and the prosecutor's comments concerning it in closing argument to the jury in the guilt phase denied him due process of law. We do not agree.
"The bias of an accused's witness in favor of the accused or against the state may be shown by evidence of statements, acts, relationships, or charges of crime that would reasonably give rise to an inference that the witness is biased." C. Gamble, McElroy's Alabama Evidence § 149.01(9) (4th ed. 1991). It is always permissible to cross-examine a witness to ascertain his or her interest, bias, prejudice, or partiality concerning matters about which he or she is testifying, and generally anything that tends to show the witness's bias, unfriendliness, enmity, or inclination to swear against a party, is admissible. See Nichols v. State, 276 Ala. 209, 160 So.2d 619 (1964); Woodard v. State, 489 So.2d 1 (Ala.Cr.App.1986); Moody v. State, 495 So.2d 104 (Ala.Cr.App.1986).
Ellzey's statement, quoted above, was relevant and was a proper subject of inquiry on cross-examination as it would reasonably give rise to an inference that Ellzey blamed the neighborhood, where the appellant and the victims resided, for the appellant's problems. This, if believed by her, could cloud her testimony, and would reasonably indicate a bias in favor of the appellant and against the state. Thus, the prosecutor's question to Ellzey on cross-examination in reference to her above-quoted statement was not plain error. Because Ellzey's statement was properly admitted in evidence, it was proper for the prosecutor to comment upon it in closing argument to the jury. See Ward v. State, 440 So.2d 1227 (Ala.Cr.App.1983).

V.
The appellant contends that the trial court committed reversible error in admitting into evidence certain testimony of Dr. Harry Albert McClaren, a forensic psychologist, who testified as a rebuttal witness for the state at the guilt phase of the trial, on the issue of the appellant's mental condition at the time of the commission of the crimes charged. Dr. McClaren's specific testimony questioned by the appellant is his statement that the appellant told him, "[I]t was four innocent lives for a night of drugs." The appellant argues that the admission of this testimony violated his privilege against self-incrimination in the guilt and sentencing phases of the trial, that it violated his right to counsel in the penalty phase, that its probative value was outweighed by its prejudicial effect, and that the prosecutor's use of the testimony in his summation to the jury in the penalty phase constituted improper argument. We will address the appellant's Sixth Amendment allegation in part XXXV, infra.
The appellant made it known at arraignment that he would pursue an insanity defense when his counsel advised the trial court that Dr. Claude L. Brown, a psychiatrist, would examine the appellant for the defense and that Dr. Brown would furnish the state a copy of his report. It was understood by the parties and the trial court that, upon receipt of Dr. Brown's report, the appellant would be examined, if necessary, by Dr. McClaren. The examinations were conducted as planned. The state bore the costs. Dr. Brown testified for the defense in the guilt phase of the trial that at the time the offenses were committed, the appellant was suffering from a mental disease or defect, and as a result was unable to appreciate the nature, quality, or wrongfulness of his acts. Dr. McClaren testified in rebuttal for the state. He disagreed with Dr. Brown's diagnosis, and stated, "While I believe he was intoxicated from various substances, he had the ability to appreciate what he was doing." He also testified that he believed that at the time of the killings the appellant understood what he was doing and realized the wrongfulness of his acts.
The record shows the following:
"Q. [prosecutor]: In your opinion, sir, based on what the defendant told you, is it highly unlikely that Fred Barber, Linda Barber, Bryan Barber, and Gerald Paravicini would be dead today if the defendant had not ingested voluntarily whatever substance he chose to intoxicate himself with?
"A. [Dr. McClaren]: That's my opinion. I believe that the intoxication accounts for most of what happened.

*1299 "Q. Based on what the defendant told you, does he have such a belief?
"A. He told me it was four innocent lives for a night of drugs."
The last statement of Dr. McClaren quoted above is the statement the appellant complains of. The appellant argues that this response to Dr. McClaren was self-incriminating and bore directly on the issue of the appellant's guilt rather than on his mental state. Because the appellant failed to object to this testimony at trial, we are required to review the issue under the plain error rule.
The general rule is that by actively pursuing an insanity defense and by introducing testimony of qualified psychologists or psychiatrists as defense witnesses, the defendant waives any potential psychotherapist-patient privilege or privilege against self-incrimination against subsequent qualified testimony or rebuttal. Ex parte Day, 378 So.2d 1159 (Ala.1979); Salmon v. State, 460 So.2d 334 (Ala.Cr.App.1984); Magwood v. State, 426 So.2d 918 (Ala.Cr.App.1982).
Fifth Amendment problems may arise, however, when an examining psychiatrist or psychologist is allowed to give testimony based upon conversations with a criminal defendant. Rule 11.2(b), Ala.R.Cr.P., addresses this problem by limiting such testimony to the mental condition of the accused. The rule provides, in pertinent part, as follows[8]:
"(b) Admissibility of Mental Examinations.
"(1) The results of examinations conducted... on the defendant's mental competency to stand trial shall not be admissible as evidence in a trial for the offense charged and shall not prejudice the defendant in raising the issue of insanity by entering a plea of not guilty by reason of mental disease or defect.
"(2) The results of mental examinations made pursuant to subsection (a)(2) of this rule [providing for examination into the defendant's mental condition at the time of the offense] and the results of similar examinations regarding the defendant's mental condition at the time of the offense conducted pursuant to Rule 11.4 shall only be admissible in evidence on the issue of the defendant's mental condition at the time of the offense if the defendant has not subsequently withdrawn his or her plea of not guilty by reason of mental disease or defect. Whether the examination is conducted with or without the defendant's consent, no statement made by the defendant during the course of any examination, no testimony by a mental health professional based upon such statement, and no other evidence directly derived from the defendant's statement shall be admitted against the defendant in any criminal proceeding except on an issue respecting mental condition on which the defendant has introduced testimony."
Thus, the question before us is whether the appellant's statement to Dr. McClaren"four innocent lives for a night of drugs"was relevant and material to "the issue of [his] mental condition at the time of the offense[s]," Rule 11.2(b)(2). We find that it was. Foremost, it was relevant and material as supporting the appellant's testimony that he did not remember what happened at the time of the offenses because he was intoxicated from ingesting alcohol and drugs. (As we have noted, the appellant admits in his brief, "The only issue in the case was whether [he] acted out of insane, drug-induced delusions and hallucinations, or whether he was just angry at his ex-wife and acted out of rage.") Paradoxically, the appellant's statement was also relevant and material as supporting Dr. McClaren's conclusion that the appellant's ingestion of drugs was the major factor affecting his mental state at the time of the offenses. In short, the appellant's statement was relevant and material to the critical determinations for the jury in evaluating the appellant's defense of insanity: the extent of the appellant's voluntary intoxication and the interplay of his intoxication with any mental defect or disease from which he might have been suffering.
*1300 Finally, we note that the only incriminating evidenceunrelated to the appellant's mental state at the time of the offenses arises from the appellant's admission that he killed the four victims. However, how incriminating could that admission be in a trial where that conclusion, i.e., the appellant killed four victims, was in essence admitted?
The admission of the statement at trial did not amount to plain error; it did not violate of the appellant's privilege against self-incrimination in either the guilt phase or the sentencing phase of the trial. We find no merit in the appellant's contention that the prejudicial effect of the testimony outweighed its probative value, nor do we find any merit in his contention that the prosecutor's comments in closing argument to the jury in the penalty phase concerning the testimony constituted improper argument. The appellant's reliance on Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), is not well taken. That case is clearly distinguishable from this case.

VI.
The appellant contends that he was denied due process of law by allegedly improper prosecutorial argument. He states generally that the prosecutor's arguments were misleading and improper, and points out in his brief specific instances of allegedly improper comment. With one exception (part VI.C.1., infra), no objections were raised during the trial to the portion of the arguments now complained of. Thus, with that one noted exception, we must review this issue under the plain error rule.
Control of jury arguments rests in the broad discretion of the trial court and, where no abuse of discretion is found, there is no error. Sasser v. State, 494 So.2d 857 (Ala.Cr.App.1986). In reviewing allegedly improper prosecutorial argument, we first must determine if the argument was, in fact, improper. If we determine that the argument was improper, we must then ask, not whether the comments influenced the jury in arriving at its verdict, but whether they might have influenced the jury. Ex parte Ward, 497 So.2d 575 (Ala.1986); Beecher v. State, 294 Ala. 674, 320 So.2d 727 (1975); Rutledge v. State, 523 So.2d 1087 (Ala.Cr. App.1987), rev'd and rem'd on other grounds, 523 So.2d 1118 (Ala.1988). When a prosecutor engages in conduct that deprives the defendant of a fair trial, the defendant's right to due process is violated. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Improper prosecutorial argument is reviewed in the context of the entire trial. United States v. Boyce, 797 F.2d 691 (8th Cir.1986); Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990). Prosecutorial misconduct is subject to a harmless error analysis.[9]United States v. Martin, 815 F.2d 818 (1st Cir.), cert. denied, 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 51 (1987); United States v. Boyce; Oliver v. Wainwright, 795 F.2d 1524 (11th Cir.1986), cert. denied, Oliver v. Dugger, 480 U.S. 921, 107 S.Ct. 1380, 94 L.Ed.2d 694 (1987).

A.
The appellant specifically argues that the prosecutor made improper references to religious matters in his arguments in the guilt phase and the sentencing phase of the trial. He complains of the following statements in the prosecutor's guilt phase closing argument:

*1301 "The Lord once said to the Pharisees, `Ye have strained a gnat and swallowed a camel.' And to accept the notion that, first of all, we must make all this craziness not crazy is to do just that."
"To everything there is a season and time and purpose unto heaven, and we are taught as children and live by the admonition that we rend or we reap what we sow."
"These folks didn't come out of some cesspool.... They were molded by the hand of God just like you and me, and all four of them had the right to live, to love, to be loved, to be whatever God would allow them to be."
He also complains of the following statement by the prosecutor in the penalty phase closing argument:
"The death penalty is the only way, ladies and gentlemen, that we as Christian civilized people can proclaim in no uncertain terms that the most precious of all God's gift is human life, and if you take human life, you forfeit your own right to live.... Somebody has got to tell the Jason Williamses of this world that enough is enough. And fate has put you in that jury box and fate has designated that you are that somebody."
After reviewing the above comments and considering the context in which they were made, we conclude that for the most part, the comments were not improper, but were either fair illustrations using biblical teachings or were appeals by the prosecutor for law enforcement. "Argument of counsel should not be so restricted as to prevent reference, by way of illustration, to historical facts and public characters, or to principles of divine law or biblical teachings." Poole v. State, 292 Ala. 590, 592, 298 So.2d 89, 91 (1974) (quoting Wright v. State, 279 Ala. 543, 550-51, 188 So.2d 272, 279 (1966)). General appeals for law enforcement are within the permissible range of a prosecutor's closing argument. Hester v. State, 608 So.2d 422 (Ala.Cr.App.1992); Henderson v. State, 584 So.2d 841 (Ala.Cr.App.1988). The biblical references were not so imbued with religious overtones as to be plain error in the context of this capital murder trial. We do not agree with the appellant's conclusion that the comments so influenced the jury that it abandoned its duty to follow the law. There is nothing to suggest that the comments might have influenced the jury in arriving at its verdicts. We find that, although a very few of these comments could be criticized as possibly bordering on improper, these comments, considered individually and in the context of the entire closing argument, did not constitute plain error.

B.
The appellant contends the following comments by the prosecutor to the jury during the penalty phase constituted reversible error:
"And what I ask you to do as the representative of the State of Alabama, is to hold him accountable."
"I do not enjoy it, I do not relish it, but I do it, first of all, because I believe it's appropriate, and, secondly, because it is my duty."
"[If you return a verdict of death] one thing will happen. As painful as it might be, we can all walk out of here knowing, first of all, that you had the wisdom to see the right and the courage to do it. If the death penalty is not appropriate for killing four people, then I can conceive of no situation where it is. Once to every man and nation comes the moment to decide and the strife of truth with falsehood for the good or evil side. Ladies and gentlemen, it is your call."
We do not view these comments as attempts by the prosecutor to exploit his position as district attorney, as the appellant argues. Rather, they are acceptable appeals to law enforcement, and as such are permissible in closing argument. Furthermore, we do not find plain error in regard to the *1302 appellant's argument that these comments were expressions of the prosecutor's opinion on the evidence.

C.
The appellant contends that the prosecutor made allegedly misleading legal arguments to the jury in the guilt phase and the sentencing phase of the trial.

1.
The appellant argues that the following comment was incorrect and prejudicial and that it had the effect of placing a "higher burden of proof" on him: "Even though the burden of proving guilt or innocence always rests with the state, [to sustain a defense of insanity, the defense has] to prove by clear and convincing evidence that [the appellant] was unable to appreciate the nature and quality and wrongfulness of his act." When the comment was made, the appellant objected on the ground that it was a misstatement of the law. He correctly pointed out that the conjunction "and" between "quality and wrongfulness" was incorrect and that the phrase should have been "quality or wrongfulness." The trial court, in overruling the appellant's objection, stated: "Again, ladies and gentlemen, I will instruct you at some length as to the law concerning mental disease or defect, and you will be guided by those instructions." We do not believe, as the appellant contends, that under the circumstances, the misstatement could have led the jury to apply an erroneous standard of proof in considering the appellant's insanity defense. The trial court made it clear to the jurors, immediately after the incorrect comment, that the court would instruct them on the law pertaining to the defense of mental disease or defect, and the record shows that it did correctly instruct the jurors on the law of that defense in its oral charge in the guilt phase. We find that this comment did not constitute reversible error.

2.
The appellant also contends that the prosecutor made erroneous comments in the sentencing phase regarding aggravating circumstances. He specifically contends that the prosecutor's argument in the sentencing phase before the jury and then before the trial court that "the defendant engaged in the commission of a robbery and a burglary" was improper because, he argues, the appellant was not charged with burglary. He argues that the prosecutor impermissibly introduced burglary as an aggravating circumstance. For example, the record shows the pertinent portion of the prosecutor's argument to the jury as follows:
"May it please the Court, ladies and gentlemen of the jury, the aggravating circumstances upon which we rely for purposes of punishment are these. First, that the defendant knowingly created a great risk of death to many persons. That is premised on the facts already in evidence that he shot and killed four people, that he shot and wounded two others, and that he shot at but missed Mr. Billedeaua. The other aggravating circumstance upon which we rely is that the capital offense was committed while the defendant was engaged in the commission of a robbery and a burglary. That, too, is premised upon facts already in evidence. The robbery being, as you have already determined by your verdict, the taking by force of the Ford Aerostar van; the burglary being that this defendant entered or remained unlawfully in the home of the Barbers with the intent to commit a crime therein.... [W]e have proven beyond a reasonable doubt two aggravating circumstances based on testimony you have already heard."
(Emphasis added.)
At the beginning of the sentencing phase before the jury, the trial court correctly advised the jury of the aggravating circumstances relied upon by the state. The trial court stated:
"The law of this state provides a list of aggravating circumstances which may be considered by the jury in determining the appropriate punishment. The circumstances which the State contends you should consider as tending to indicate that the penalty of death is appropriate, are the following: the State contends that the defendant knowingly created a great risk of *1303 death to many persons, and contends that this is an aggravating circumstance which it feels should lead you to impose a penalty of death. The State further contends that another aggravating circumstance is that the capital offense was committed while the defendant was engaged in the commission of or an attempt to commit robbery. Those are the two aggravating circumstances which the State contends exists."
The trial court correctly instructed the jury in accordance with §§ 13A-5-40(a)(2) and 13A-5-50, that the aggravating circumstance specified in § 13A-5-49(4), i.e., that the capital offense was committed while the defendant was engaged in committing or attempting to commit a robbery, had been proven by virtue of the jury's guilty verdict for murder-robbery and that the jury should consider it without the necessity of further proof in recommending a sentence. The trial court again correctly instructed the jury at the close of the presentation of evidence at the sentencing phase on the aggravating circumstances relied upon by the state. The court stated:
"I have told you that the State has advanced two aggravating circumstances; that you have found one of them already to exist beyond a reasonable doubt, and that is that the capital offensesone of them, at least, were committed in the commission of or attempt to commit the crime of robbery. The State has also asserted that the defendant knowingly created a great risk of death to many persons. The burden is on the State to prove beyond a reasonable doubt, as I defined that term to you, the existence of that circumstance."
In its sentencing order, it found the existence of two aggravating circumstances as follows:
"The aggravating circumstances advanced by the State are, first, that the capital offense was committed while Defendant was engaged in the commission of a robbery. That is, that Defendant killed the Barbers while engaged in robbing them of their vehicle. This was required to be, and was, proven beyond a reasonable doubt as a part of the capital indictment charging murder during the course of a robbery. This aggravating circumstance exists.
"The second aggravating circumstance asserted is that Defendant knowingly created a great risk of death to many persons. Defendant shot and killed four persons, shot and wounded two more and shot [at] and missed another; not to mention his beating Mrs. Paravicini with a rifle. This aggravating circumstance is also proved beyond a reasonable doubt."
We note that no objections were raised in the trial court to the remarks by the prosecutor now complained of. Thus, we review them under the plain error rule. In view of the correct, clear, thorough, and repeated instructions by the trial court to the jury concerning the aggravating circumstances it should consider, we do not believe that there was any reasonable possibility that the jury might have considered an improper aggravating circumstance, i.e., that the offense was committed during the commission of a burglary, in recommending a sentence. Where the jury is properly instructed, it is presumed that it followed those instructions. Kennedy v. State, 472 So.2d 1092 (Ala.Cr. App.), aff'd, 472 So.2d 1106 (Ala.1985), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). There is no question that the jury was properly instructed. The record also shows that the trial court was not misled by the prosecutor's argument that a burglary, as well as a robbery, had occurred. Not only do we consider this conclusion to be supported by the trial court's sentencing order, it is supported by the trial court's instructions to the jury. Further, it is presumed that the trial judge will follow his or her own instructions. Ex parte Harrell, 470 So.2d 1309, 1318 (Ala.1985). Under the circumstances presented here, we find no plain error. There is no probability that a substantial right of the appellant has been adversely affected, nor can it be said that any error as to the arguments is so obvious that the failure to notice seriously affected the fairness or integrity of the proceedings.

D.
The appellant contends that the prosecutor in his arguments improperly attempted *1304 to extract promises from the jury. No objection was raised to these arguments in the trial court; therefore, this argument must be reviewed under the plain error rule. The arguments complained of are as follows:
"[W]hen you were qualified Monday morning, you were asked a specific question. In determining the state of mind of the defendant, do you think it is important to consider what he said and what he did at the time the crime was committed? And you said you did.
"....
"On Monday morning you were placed under oath, and one of the questions you were asked after you [were] placed under oath was this: `If you are satisfied of the defendant's guilt beyond a reasonable doubt, and if you are satisfied that the aggravation outweighs the mitigation, could you impose a penalty of death by electrocution? And each and every one of you said yes; otherwise, you wouldn't be sitting here as jurors today. So we are not to concern ourselves with what goes on in other states. We are to concern ourselves with the reality of this moment and what brings all of us here at this point in time. And that is that you said under oath if you were satisfied that the burdens of proof had been metand I submit to you that they have beenthat [you] could do something that is painfully difficult to do."
The prosecutor in these arguments was reminding the jurors of responses they had made in the voir dire examination during jury selection process. There is certainly nothing improper in merely reminding the jurors that they had responded on voir dire that they would consider what the appellant said and did at the time the crimes were committed in determining his state of mind and that they could recommend imposing a sentence of death if they found the defendant guilty beyond a reasonable doubt and if they were satisfied that the aggravating circumstances outweighed the mitigating circumstances. In regard to the second comment, the prosecutor was arguing that the state had met its burden of proof in the case and was asking the jury to recommend that the appellant be sentenced to death. Considering the arguments and the context in which they were made, we do not find them to be improper. We find no plain error in these arguments.

E.

1.
The appellant contends that the following comment by the prosecutor in the guilt phase of his closing argument was improper because, he says, it inflamed the passions of the jury:
"These folks didn't come out of some cesspool.... They were molded by the hand of God just like you and me, and all four of them had the right to live, to love, to be loved, to be whatever God would allow them to be."
The prosecutor should not make remarks to the jury that are likely to inflame the passions of the jurors, if the purpose of making those remarks is to lead the jury to convict for an improper reason. United States v. Sepulveda, 15 F.3d 1161 (1st Cir. 1993); Nicks v. State, 521 So.2d 1018 (Ala.Cr. App.1987). We have previously addressed this comment in part VI.A., and have held that it did not constitute plain error.

2.
The appellant contends that the following comment by the prosecutor during closing argument in the sentencing phase was improper because, he says, it inflamed the passions of the jury:
"These crimes are graphically portrayed in the pictures. I am not going to show them to you again. They are in evidence. Please look at them because if there is a time to weep those for whom we should weep are those who have gone to their great reward."
The gruesome or inflammatory nature of a photograph is not grounds for exclusion from evidence where the photograph has a reasonable tendency to prove or disprove some material fact in issue. Braswell v. State, 371 So.2d 992 (Ala.Cr.App.1979). However, the prosecutor's comment regarding the properly admitted photographs was obviously not related *1305 to a fact in issue and, in our opinion, bordered on being improper. However, in view of the entire record, we do not find the comment constitutes plain error.

3.
The appellant also contends that the following comments of the prosecutor in his final argument during the sentencing phase were improper because they inflamed the passions of the jury:
"[T]his man who sits before you in tears today but who was a crackhead, who was eating acid on the 15th of February maliciously and willfully snuffed out the lives of four human beings. He has proved by his conduct that he has absolutely no regard for the value of human life.... So when you think about emotion and you think about weeping, weep for the dead for they are not here to tell us that they are sorry they are not alive. They are not here to tell us they are sorry they are not here to raise their children. They are not here to tell us that they are sorry that their families were devastated by the actions of Jason Williams.
"....
"In determining the appropriate punishment, consider also why the law punishes people. The law punishes, first of all, to serve justice. Again, justice gives to each that which is his due. And a rather compelling argument, I would suggest, is that if a man goes out and kills four people on a Saturday morning he has forfeited his right to live. But we punish for yet a second reason, and that is to protect good and decent people in their homes and on these streets from the likes of Jason Williams."
While we do not condone certain aspects of these comments, we do not believe they constitute plain error. For the most part, they are legitimate comments on the evidence and pleas for law enforcement. In Alabama, we follow a "wide latitude of argument" rule: counsel is allowed wide latitude in drawing reasonable inferences from the evidence in closing argument. Jones v. State, 600 So.2d 424 (Ala.Cr.App.1992). Counsel has the right to present impressions from the evidence and to argue every legitimate inference from the evidence. McWilliams v. State, 640 So.2d 982 (Ala.Cr.App. 1991), aff'd in part, rem'd in part on other grounds, 640 So.2d 1015 (Ala.1993), aff'd in part, rem'd in part on other grounds, 640 So.2d 1025 (Ala.Cr.App.1994).
In conclusion, we have considered the cumulative effect of all the comments complained of and we find no plain error.

VII.
The appellant contends that the trial court erred in failing to define for the jury the felonious intent requirement of robbery in the first degree, and thereby failed to properly define the capital offense of murder-robbery. The appellant did not object to the trial court's instructions on this ground during the trial. Thus, we review this issue under the plain error rule.
A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App.1991). A trial court's oral charge to the jury must be construed as a whole, and must be given a reasonable not a strainedconstruction. King v. State, 595 So.2d 539 (Ala.Cr.App.1991); Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.1984).
After considering the trial court's oral charge in its entirety, we conclude that it adequately instructed the jury on the intent element of robbery in the first degree. We further conclude that the trial court properly instructed the jury on all the elements of the offenses charged, including the capital offenses. We find no merit in this argument, and certainly no plain error.

VIII.
The appellant contends that the trial court's jury instructions amounted to reversible error because, he argues, they permitted the jury to convict him of capital murder on a finding of reckless murder under § 13A-6-2(a)(2), rather than on a finding of intentional murder as defined in § 13A-6-2(a)(1) and required for a conviction under § 13A-5-40(b). *1306 He argues that "a reasonable juror could have interpreted capital murder as only requiring extreme recklessness." No objection was raised in the trial court to the instructions on the ground now asserted on appeal. Thus, we review this contention under the plain error rule. In setting forth the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 1197-98, 108 L.Ed.2d 316 (1990), for the proposition that "an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner."
After carefully reviewing the instructions of the trial court, we find no merit in the appellant's contention. The trial court correctly instructed the jury on the elements of the offenses charged in the indictments, including the lesser included offenses. The trial court instructed the jury over and over again, in clear and unmistakable language, that the term "murder" as used in defining the capital offenses charged meant intentional murder as that term is defined in § 13A-6-2(a)(1).
Additionally, closing arguments of counsel, written requested instructions of the appellant given by the trial court, copies of the indictments that the jury had before it during its deliberations, and the verdict forms covering all possible verdicts the jury could return, correctly stated the law as to the elements of the offenses charged. There is no reasonable likelihood or probability in this case that a juror was or might have been misled by the trial court's instructions into believing that he or she could convict the appellant of a capital offense by finding that he had committed reckless murder rather than intentional murder. In fact, the jury's verdicts make that clear. The verdicts finding the appellant guilty of the capital offenses state: "With respect to the capital charge alleging the intentional murder of Freddie Barber and Linda Barber during the course of a robbery, we find the Defendant... Guilty of the capital offense." and, "With respect to the capital charge alleging the intentional murder of Gerald Paravicini, Freddie Barber, Linda Barber, and Bryan Barber, we find the Defendant ... Guilty of the capital offense." (Emphasis added.) We find no error, certainly no plain error, in the trial court's instructions.

IX.
The appellant contends that the trial court's instruction to the jury on non-statutory mitigating circumstances which the jury should consider in sentencing him under § 13A-5-52 were improper because they allegedly inadequately guided the jury's consideration of the non-statutory mitigating circumstances and denigrated their importance. The appellant argues that the instruction implied that the statutory mitigating circumstances listed in § 13A-5-51 are more important than the non-statutory ones referred to in § 13A-5-52. He also argues that the instruction on the non-statutory mitigating circumstances were improper because they "informed the jury that the defendant suggested rather than the law required consideration of these mitigating circumstances." Again, we note that no objection was raised at trial to the instruction and, therefore, we review this issue under the plain error rule. With the appellant's contentions in mind, we have reviewed the trial court's instruction to the jury pertaining to the law relating to mitigating circumstances in its entirety and find it to be correct. The instruction was clear and thorough and properly guided the jury. We do not believe that there was a reasonable likelihood or probability that the jury was or could have been misled by the instruction as the appellant contends. The appellant asks us to give the instruction a construction that is strained. We find no merit in these contentions and no plain error.

X.
The appellant contends that the trial court's instructions were improper because, he argues, they would wrongfully lead a reasonable juror to believe that a unanimous vote was required for the jury to find the existence of a mitigating circumstance. He also contends that the trial court erred in not instructing the jury that it did not have to unanimously find that a mitigating circumstance *1307 existed before a juror could consider that circumstance in reaching his or her decision during the penalty phase. He cites Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), in support of his contention. In Mills v. Maryland, 486 U.S. at 384, 108 S.Ct. at 1870, the United States Supreme Court held that a sentence of death must be vacated where "there is a substantial probability that reasonable jurors, upon receiving the judge's instructions... well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." Again, no objection was made to the instructions in the trial court.
Section 13A-5-45(g) provides:
"The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."
The instructions to the jury in the present case in concerning the manner of establishing the existence of mitigating circumstances were in accordance with § 13A-5-45(g) and the Alabama Pattern Jury Instructions: Criminal. The jury was instructed that the appellant had the burden of interjecting a mitigating circumstance, but once it was interjected the state had the burden of disproving the factual existence of any mitigating circumstance by a preponderance of the evidence. The court gave no instruction suggesting that a finding of a mitigating circumstance had to be unanimous.
The Alabama Supreme Court addressed this identical issue in Ex parte Martin, 548 So.2d 496, 499 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), and held that under the instructions given in Martin, "the jurors could not have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating factor." For cases following Martin, see Hutcherson v. State, 677 So.2d 1174 (Ala.Cr.App.1994); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). The instructions given in Martin are substantially the same as those given in the instant case. After reviewing the instructions in the present case in their entirety, we conclude that there is no reasonable likelihood or probability that the jurors believed or could have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating circumstance. The instructions were not only legally correct, but were clear and understandable. The case relied upon by the appellant, Mills v. Maryland, is factually distinguishable from the instant case. We find no merit in the appellant's contention, and no plain error in the instructions.

XI.
The appellant contends that § 13A-5-46, which provides that the jury's verdict in a capital case will be advisory, violates Art. I, § 11, of the Alabama Constitution of 1901, which provides that "the right of trial by jury shall remain inviolate."
"This issue has been fully addressed by this court, and it was determined that `the advisory nature of the jury's sentence verdict under § 13A-5-46, Code of Alabama 1975, is not violative of Article I, Section 11.' Crowe v. State, 485 So.2d 351, at 364 (Ala.Cr.App.1984), rev'd on other grounds, Ex parte Crowe, 485 So.2d 373 (Ala.1985)."
Edwards v. State, 515 So.2d 86, 89 (Ala.Cr. App.1987). We further held in Edwards v. State, 515 So.2d at 89, "The jury's role in sentencing under our bifurcated trial process is merely advisory in nature. This procedure was established in Beck v. State, 396 So.2d 645 (Ala.1980), and was determined to be constitutional." We find no merit to the appellant's contention.

XII.
The appellant contends that § 13A-3-1, Code of Alabama 1975, as revised in 1988, providing for the defense of mental disease or defect, commonly referred to as the insanity *1308 defense, in a criminal prosecution is constitutionally inadequate. He contends that § 13A-3-1 wrongfully precludes a defendant from presenting as a defense that at the time of the commission of the offenses the defendant was unable to conform his or her conduct to the requirements of the law because the defendant suffered from a mental illness that was, at the time of the offense, aggravated by substantial drug use. He argues that § 13A-3-1 is unconstitutional because, he says, it violates his rights to due process, equal protection, trial by jury, and protection against cruel and unusual punishment. He argues that the statute denies due process of law to defendants who are unable to conform their conduct to the requirements of law, because it denies them the right to raise the defense of volitional impairment (inability to conform one's conduct to the requirements of the law); the inability to raise this defense, he contends, results in the punishment of nonblameworthy and mentally ill persons. He contends that the statute improperly restricts the insanity defense to only those mentally ill defendants who are cognitively impaired (unable to appreciate the nature and quality or wrongfulness of one's acts), thus denying those who are volitionally impaired equal protection of the law. In his assertion that the statute denies him the right to trial by jury, he argues that by not allowing jurors to consider evidence of volitional capacity, the law prevents the jury from accurately determining the sanity and criminal responsibility of defendants. He also argues that holding volitionally impaired defendants criminally responsible violates the prohibition against cruel and unusual punishment.
"In 1988, the Alabama legislature replaced our insanity defense statute by enacting the `Reasonable Insanity Test Act of 1988,' 1988 Ala.Acts 1051, No. 88-654, now codified at Ala.Code § 13A-3-1 (Supp. 1990). Subsection (a) of that statute provides that:
"`It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.'
"Section 13A-3-1(a) is virtually identical to the federal insanity defense statute, 18 U.S.C. § 17(a) (1988), which `was passed in the wake of John Hinckley's acquittal of charges arising from his actions in shooting President Ronald Reagan and Press Secretary James Brady.' United States v. Cameron, 907 F.2d 1051, 1061 (11th Cir. 1990).
"The new Alabama and federal insanity statutes represent a significant change from the insanity defenses previously available in criminal trials."
Ware v. State, 584 So.2d 939, 942 (Ala.Cr. App.1991).
In considering a challenge to the constitutionality of the federal Insanity Defense Reform Act, the United States Court of Appeals of the Eleventh Circuit stated:
"The definitional change of insanity brought about by the Insanity Reform Act does not violate the defendant's constitutional rights. Admittedly, under the new statute, a defendant who is unable to conform his actions to the requirements of the law may be convicted of a crime. Such a conviction, however, does not constitute cruel and unusual punishment. A primary reason that the definition of insanity was altered by the Insanity Reform Act is that psychiatrists themselves are unable to agree upon the meaning of `an irresistible impulse.' See S.Rep. 225, 98th Cong., 2d Sess. 226-29, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3408-11. In light of the uncertain nature of psychiatric theory in this area, we decline to alter Congress' decision that society must be protected from individuals who may be unable to conform their conduct to the law. When psychiatrists are unable to diagnose, much less treat, such individuals, it is not cruel and unusual punishment for Congress to restrict the defense of insanity to those persons who are capable of proving that they did not understand the nature and quality of the act committed." *1309 United States v. Freeman, 804 F.2d 1574, 1576-77 (11th Cir.1986).
The Due Process Clause is satisfied so long as the law bears a reasonable relation to a proper legislative purpose and is neither arbitrary nor discriminatory. Fowler v. State, 440 So.2d 1195 (Ala.Cr.App.1983). Section 13A-3-1 bears a reasonable relation to a proper legislative purpose and does not violate the appellant's due process rights. Section 13A-3-1 does not deny the appellant equal protection of the law. It does not treat persons similarly situated differently nor does it contain unreasonable classifications. See Craig v. State, 410 So.2d 449 (Ala.Cr. App.1981), for the test of an equal protection violation. We find no merit in the appellant's contention that § 13A-3-1 denies him the constitutional right of trial by jury and we see no violation of the prohibition against cruel and unusual punishment. The definitional change of insanity proposed by the 1988 amendment, eliminating the volitional prong from the statute, does not render it constitutionally inadequate. Hart v. State, 702 P.2d 651 (Alaska App.1985). We hold that § 13A-3-1 is not unconstitutional. It comports with generally accepted concepts of basic standards of justice. See Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952); Hart v. State.

XIII.
The appellant contends that the express repudiation of the diminished capacity defense in § 13A-3-1 denies him due process and renders the statute unconstitutional. He argues that the statute denies him the right to present evidence of his mental capacity on the issue of intent and relieves the state of its burden to prove beyond a reasonable doubt every element of the offense charged. After defining mental disease and defect and making it an affirmative defense, § 13A-3-1 provides that "[m]ental disease or defect does not otherwise constitute a defense." The appellant contends that this provision prohibited the jury from considering evidence of his mental disorder on the question of intent.
The doctrine of diminished capacity provides that evidence of an abnormal mental condition not amounting to legal insanity but tending to prove that the defendant could not or did not entertain the specific intent or state of mind essential to the offense should be considered in determining whether the offense charged or one of a lesser degree was committed. 22 C.J.S., Criminal Law § 97 (1989). See also W. LaFave and A. Scott, Substantive Criminal Laws, § 4.7 (1986) (noting that the doctrine of diminished capacity is recognized in some jurisdictions). Alabama has expressly rejected this doctrine. Barnett v. State, 540 So.2d 810 (Ala.Cr.App.1988); Hill v. State, 507 So.2d 554 (Ala.Cr.App.1986), cert. denied, 507 So.2d 558 (Ala.1987); Neelley v. State, 494 So.2d 669 (Ala.Cr.App.1985), aff'd, 494 So.2d 697 (Ala.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987). A state is not constitutionally compelled to recognize the diminished capacity doctrine. Campbell v. Wainwright, 738 F.2d 1573 (11th Cir.1984); Muench v. Israel, 715 F.2d 1124 (7th Cir. 1983), cert. denied, Worthing v. Israel, 467 U.S. 1228, 104 S.Ct. 2682, 81 L.Ed.2d 878 (1984); Chestnut v. State, 538 So.2d 820 (Fla. 1989). The express repudiation of the diminished capacity doctrine § 13A3-1 does not render that statute unconstitutional. We find no merit to the appellant's contention, and certainly do not find plain error.

XIV.
The appellant contends that the trial court erred in instructing the jury on the appellant's burden of proof to establish mental disease or defect as a defense. The trial court, quoting the wording of § 13A-3-1(c), instructed the jury that the appellant had the burden of proving his defense of insanity by "clear and convincing evidence." The court did not define the meaning of "clear and convincing evidence," and the appellant contends that because the court did not define this phrase the jury might have interpreted the instruction as requiring proof beyond a reasonable doubt, which is a higher degree than that required by the statute. No objection was raised in the trial court to these instructions or to the court's failure to define "clear and convincing evidence." In fact, the appellant submitted to the trial court a written *1310 requested instruction asking the court to instruct the jury using the words of the statute, which the court did.
We have reviewed the trial court's instructions in their entirety, and we find the instructions on the appellant's burden of proof necessary to establish an insanity defense and on the beyond a reasonable doubt burden required of the state in proving the elements of the offenses to be clear, understandable, and correct. The record does not support a conclusion that there is a reasonable likelihood or probability that the jury misunderstood or could have misunderstood or been confused by the instruction and placed a higher burden on the appellant than § 13A-3-1 requires. The words "clear and convincing" are words of such common usage and understanding that a reasonable juror would be expected to understand their meaning. We find no plain error in these instructions.

XV.
The appellant contends that the trial court erred in sustaining the prosecutor's objections to testimony of defense witness Ellzey. He asserts that because the trial court repeatedly sustained those objections, he was unable to present his insanity defense. He states that, through Ellzey's testimony, he was attempting to establish his state of mind at the time he and Ellzey were talking on the telephone on the day after the crimes were committed. He calls our attention to one instance in the record where the prosecutor's objection was sustained. The record shows:
"Q. [defense counsel]: What ... did y'all do or what was said after you told him about what had occurred that morning?
"A. [Ellzey]: I told him
"MR. GALANOS [prosecutor]: Excuse me. We object on the grounds that one, it's hearsay
"THE COURT: Sustained.
"Q. What did you say to him, Sandy?
"MR. GALANOS: Same objection, same grounds.
"THE COURT: Sustained.
"MR. YELVERTON: What she said, Judge?
"THE COURT: Absolutely.
"MR. YELVERTON: Mr. Madden [defense counsel] informs me if it's offered for his then existing mental state, Judge, that that would be an exception.
"THE COURT: As to whose then existing mental state?
"MR. YELVERTON: (Pointing.)
"THE COURT: Sustain the objection."
After reviewing Ellzey's entire testimony, we find that she was allowed to testify fully about the telephone conversation she had with the appellant and about his mental state at the time. The record shows the following:
"Q. [defense counsel]: Did you ask him if he shot those people, or why he shot those people?
"A. [Ellzey]: The first thing I asked him when I heard his voice on the phone, I asked him if he was okay. And he was crying and he said, `No,' he wasn't okay, you know, that he didn't know what had happened. And I said, `Well, Jay,' I said, `Gerald is dead.' And he started crying, and he got real upset. And I said, `Jay you don't know what happened?' He said, `Sandy, I am in a van, and I don't know who it belongs to,' he said, `and I have blood on me.' He said, `I don't know what's happened.' And when I had told him about Gerald he got real upset, and then I told him about the other people, and he just kept saying, `I shot Gerald, I shot Gerald, Gerald is dead.' It was like he just couldn't believe it. He just kept saying that over and over again."
"Q. Did Jay make a suggestion to you that he would turn himself in?
"A. Yes, sir, heat this point I still didn't know where he was, and he had wanted to
"MR. GALANOS: We respectfully object again, on the grounds that it's hearsay.
"THE COURT: Well, it's not responsive. Mr. Galanos, I think, in the abundance of caution that it's probably best *1311 to let the witness explore thatlet counsel explore that conversation with the witness.
"I am going to tell you this, ladies and gentlemen, the defense is offering the testimony of this lady as to what her conversation with the defendant was for the purpose of attempting to show what the defendant's mental state was at that time. You are not to consider this testimony as in any way proving what either of them said was true. It is simply offered for the purpose of showing what was said. Its truth or non-truth is not material for our purposes here. So you are just going to get to hear what they said, and you are not to assume that the facts of the matters stated in that conversation were true.
"All right. Go back to where you were.
"Q. Okay. Was there a discussion, Sandy, about Jay turning himself in?
"A. He had told me that he wanted to come back to Mobile and [for] me to meet him somewhere and he wanted to go turn [himself] in.
"Q. And you hadhad you previously told him he faced a capital charge?
"A. Yes."
The record shows that the appellant was not prevented from eliciting evidence from Ellzey as to his mental condition, as he contends. Without an offer of proof from defense counsel to show otherwise, we can assume only that the information she possessed that could shed light on the appellant's mental condition at the time was presented to the jury for its consideration. If the trial court erred in sustaining the objections of the prosecutor to the questions set out above, in view of the fact that the sought-after testimony was elicited in other parts of Ellzey's direct examination, the error was harmless. Ala. R.App.P. 45.

XVI.
The appellant contends that during the investigation of this case the investigators lied to Ellzey to obtain her cooperation. He contends that Ellzey's statement to the investigators and her subsequent testimony before the grand jury were not given voluntarily and should have been suppressed because, he argues, they were obtained by coercion. He argues that consequently the trial court should not have allowed the state to use Ellzey's statement and grand jury testimony when cross-examining her.
The appellant did not object during the trial to the voluntariness of her statement and grand jury testimony, but raised this issue for the first time in his motion for a new trial. Grounds urged in a motion for a new trial must ordinarily have been preserved at trial by timely and sufficient objections. Hamrick v. State, 548 So.2d 652 (Ala. Cr.App.1989). This issue was not preserved for appellate review, and we must therefore review it under the plain error rule.
The appellant had no standing to challenge the voluntariness of Ellzey's statement or grand jury testimony. The general rule is that a defendant has standing to challenge the admission of evidence only if the defendant's constitutional rights have been violated. United States v. Salvucci, 448 U.S. 83, 86-87, 100 S.Ct. 2547, 2550-51, 65 L.Ed.2d 619 (1980); Rakas v. Illinois, 439 U.S. 128, 134, 99 S.Ct. 421, 425-26, 58 L.Ed.2d 387 (1978); United States v. Sims, 845 F.2d 1564, 1568 (11th Cir.), cert. denied, 488 U.S. 957, 109 S.Ct. 395, 102 L.Ed.2d 384 (1988); United States v. Fortna, 796 F.2d 724, 732-34 (5th Cir.), cert. denied, 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986). However, the rule that constitutional rights may not be vicariously asserted has not been universally followed. However, those circumstances have sometimes led to a holding to the contrary. See, e.g., NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Those special circumstances giving rise to exceptions to the general rule do not exist in this case. We find no plain error in the trial court's denial of the appellant's motion for a new trial challenging the voluntariness of Ellzey's statement and grand jury testimony.

XVII.

A.
The appellant contends that the trial court committed reversible error when it denied *1312 his motion for individual voir dire of the veniremembers to determine whether their impartiality had been destroyed by pretrial publicity.
"Whether to allow individual voir dire examinations is within the trial court's discretion. Hallford v. State, 548 So.2d 526, 538 (Ala.Crim.App.1988), affirmed, 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). Furthermore, `"the decision of the trial court in denying individual voir dire examination will not be disturbed absent abuse of that discretion."' Henderson v. State, 583 So.2d 276, 283 (Ala.Crim.App.1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992) (quoting Hallford, 548 So.2d at 538)."
Ex parte Anderson, 602 So.2d 898, 899 (Ala. 1992).
Before the voir dire examination of the venire, the appellant requested that he be allowed to individually question the veniremembers regarding publicity about the case, mental health issues, and the death penalty. The trial court denied the motion. Out of concern that the entire venire might be contaminated by any prejudicial remarks by the veniremembers, the appellant then moved the trial court to separate the venire into panels of 12 for questioning. The trial court also denied that motion; however, it stated that it would allow a full and sifting examination of the veniremembers by the parties and indicated that if any veniremember professed to have any knowledge of the matter other than that which had already appeared in the media, that person would be examined in camera.
Upon the assumption that the members of the venire had heard about the case through the media, the trial court inquired of them as follows:
"Now ... I would assume that many or most of you have had at least some exposure to the charges in the case through the media. Is there anyone who does not feel that they could try the case fairly and impartially and on the basis of the testimony they hear here in court as opposed to what they may have heard or seen or read through the media?
"(No response.)"
Thereafter, when defense counsel asked the veniremembers whether they had been exposed to publicity about the case through the media, 39 members answered affirmatively. The trial court separated those members into five panels of six members and one panel of nine members, and the veniremembers were then questioned regarding their exposure to the publicity, whether they had formed an opinion based on that publicity, and whether they could set aside anything that they had heard and decide the case fairly and impartially.
Under these circumstances, the trial court did not abuse its discretion in denying the appellant's motion seeking individual voir dire. The procedure employed by the trial court was sufficient for it and the parties to acquire adequate information to make an independent determination as to the veniremembers' impartiality. See Brown v. State, 632 So.2d 14 (Ala.1992).

B.
The appellant also claims that the following comments made by L.M., a member of the venire, in the presence of the entire venire tainted the venire and that the trial court's failure to sua sponte empanel a new venire denied him the rights to due process and to a fair trial:
"[defense counsel]: ... I need to ask you this, I guess. Is there anyone here that believes that the defense of not guilty by reason of insanity is usually trumped up, or fake, or bogus, or something on that nature?
"....
"[L.M.]: ... You said something about did I think insanity was a lot of times trumped up. The answer is `Yes.' I have seen too many reports in the news where people were pleading insanity and they go to an insane asylum and then they get treatment and then they are out on the streets again. There are so many repeat offenders who come through that line, and I wouldn't automatically go for an insane thing because too many times it's used too often. *1313 "[defense counsel]: How about the other side of that? Would you automatically think that it must be bogus?
"[L.M.]: I would have to hear the evidence. But, I mean, from all the newspapers and TV reports and stuff like this that I read it seems like more and more often the insanity plea is used more and more and more, and you use it so often and it sounds like it's a big copout, and it's like whenever it comes up you automatically stand back and say, `I am going to look at this twice.'"
Although the appellant, in his brief to this court, would have us believe that the above comments by L.M. were spontaneous, it can clearly be seen that the comments were a direct response to defense counsel's inquiry. Defense counsel's question was obviously designed to obtain information to aid the appellant in exercising his peremptory strikes or to support a challenge for cause. The question was pertinent and was designed to ferret out anyone on the venire who was biased against an insanity defense. In substance, L.M. stated that she would consider an insanity defense, but that due to some reservations she had, she would consider it carefully. The appellant, by his question, invited the response, and was obviously seeking the information she gave. After reviewing L.M.'s response and the voir dire in its entirety, we do not believe that it can be reasonably concluded that her response amounted to plain error, i.e., that it has or probably has affected a substantial right of the appellant or that it constitutes error that is so obvious that the failure to notice it would seriously affect the fairness of the proceedings.
Next, the appellant takes issue with L.M.'s response to a question by the defense concerning the meaning of "life without the possibility of parole." The record shows the following:
"MR. MADDEN [defense counsel]: .... If the State proves beyond a reasonable doubt and to a moral certainty that this young man is guilty of a capital offense, and you go into the second trial where you hear aggravating and mitigating circumstances, then the Judge is going to tell you, `When I instruct you that life without the possibility of parole means life without the possibility of parolenot maybe in 15 years, not maybe in 20 years, not maybe when you are 75, but never'is there any one of you who doesn't really believe that? [L.M.], you don't really believe that?
"[L.M.] Well, I mean, I am not saying that I would think [the judge] was lying.... I do respect [the Court], but not too long ago there was an instance about a guy who originally got a sentence of life without parole and he had [a] new hearing, a new trial, and got his sentence changed to where now in about six or seven years if he has good behavior and all that kind of stuff. So just because [the judge] says one thing doesn't mean that down [the] road I mean, [the judge] could croak and some other judge could take over and it might change."
Because defense counsel made no motion or request regarding L.M.'s responses, this claim is reviewed under the plain error standard.
In reviewing this response, we are mindful of the principle expressed by the Alabama Supreme Court in Ex parte Rutledge, 482 So.2d 1262, 1265 (Ala.1984), that "comments upon the probability or possibility of what might happen under a particular sentence, falling outside the evidence and the law of the case, constitute improper argument." In Rutledge, the Court condemned the prosecutor's comment to the effect that so long as parole boards, federal courts, and the state legislature exist, there is a chance that, if given a sentence of life imprisonment without the possibility of parole, the defendant would eventually be released.
Rutledge is distinguishable from the instant case. For example, we are reviewing the issue here under the plain error standard, while in Rutledge the error was preserved. In addition, the comments made here were made not by the prosecutor but by a veniremember. See id. ("For the District Attorney to contradict the court's statement of the law, under which the jury is instructed to discharge its sworn duty, is tantamount to the usurpation of the trial court's function and constitutes prejudice to the substantial *1314 rights of the defendant.") However, the most distinguishing factor is that the record refutes any suggestion that L.M.'s comments may have influenced the venire. The venire was, in effect, polled on whether any veniremember was affected by L.M.'s comments as follows:
"MR. MADDEN [defense counsel]: I think this is a realvery important point, and I need to know if there is anyone else that, notwithstanding what the Judge will tell you, that you would think in your mind `We better go for capital punishment because life without parole doesn't really mean that.' I need to know who you are if you think that way.
"(No response.)
"MR. MADDEN: Okay. I take it you all will follow the law in that respect and the other respects."
In regard to L.M.'s response, the appellant states, in his brief, "The prejudice of these comments was aggravated by the fact that [L.M.] had personal knowledge about the crime and about Mr. Williams from neighbors... and she told the sixty other jurors that she therefore could not be impartial!" (Emphasis in brief.) Although L.M. did, in fact, have knowledge of the crime, she stated to the court during voir dire of her panel that although she had told other veniremembers that she could not be impartial, they did not ask her for any details and she did not discuss the crimes with them. Even considering these circumstances, the above comments do not rise to the level of plain error. From defense counsel's failure to move to have a new venire empaneled, to request that the venire be further polled, or to ask that the court give the venire curative instructions, it is reasonable to assume that, at the time the above responses were made, defense counsel did not believe that L.M.'s comments prejudiced the appellant. Defense counsel, therefore, "failed to pursue the course of action necessary to investigate the potential contamination of [his] client[`s] jury." See Battle v. State, 574 So.2d 943, 946 (Ala.Cr. App.1990) (quoting Gibson v. State, 555 So.2d 784, 797 (Ala.Cr.App.1989)).

C.
The appellant contends that the second and sixth venire panels were contaminated by similar responses by veniremembers T.W. and M.S. The following occurred during questioning of T.W.:
"MR. YELVERTON [defense counsel]: Did ... you form any opinions about who it was that had done this or what would motivate a person to do something like that, T.W.?
"[T.W.]: Well, I didn't see all of the newscast. I just saw pieces of it. I just knew or heard that someone had committed some terrible problems. I didn't know anything about the details.
"MR. YELVERTON: Did you formulateand let me say, you know, we agree with you, it's a terrible tragedy. But what we want to know is did you formulate any opinions, ever how small they may be and reluctant [as] you may be to admit those, about Mr. Williams sitting over here, this young man?
"[T.W.]: I didn't know it was Mr. Williams. I don't remember any names or anything. Just the news just said that supposedly someone had killed some people stealing a car, went crazy or whatever. That's about all I remember about it."
And, the following occurred during questioning of M.S.:
"MR. YELVERTON: [M.S.], can you tell us where you learned of this incident?
"[M.S.]: On TV.
"MR. YELVERTON: TV. And the same question I have asked everybody. Was this right afterwards, [M.S.]?
"[M.S.]: It was right after. You know, it's kind of sketchy, the facts, the way I remember them.
"MR. YELVERTON: Do you recall if you had any discussion with any family, friends, or neighbors about any of the things that you read about or heard about on the news?
"[M.S.]: The only thing we discussed was at work about how close it was, and how violent it was, and how it was happening here now and not in the big cities anymore. *1315 That we were so close to it in Theodore and Fowl River.
"....
"MR. YELVERTON: Okay. And you said you talked about the fact of this happening here now and those sorts of things. Did any of your friends or you express any beliefs or feelings about what you thought had happened to this particular individual, regardless of what the circumstances were?
"[M.S.]: No, I really don't believe we did. To my best knowledge I just remember us talking about now it was right here with us instead ofwe could always say before it was in New York, or New Orleans or Atlanta. But it was getting scary because things like that were happening right here. That's the only thing we discussed."
We again note that the appellant did not pursue any course of action when these remarks occurred. We do not believe that these comments rise to the level of plain error.

XVIII.
The appellant contends that the trial court erred when it instructed the jury in the guilt phase that it could not speculate on the consequences of a verdict of not guilty by reason of insanity. The appellant argues that this instruction was erroneous because of veniremember L.M.'s comment, quoted in part XVII of this opinion, to the effect that persons found insane were often treated and released. He argues that the court's instruction and L.M.'s comment taken together had an "unfair and chilling impact on the jury's assessment of the plea of insanity."
The specific comment by L.M., which follows, was in answer to a question directed to the venire by the appellant's trial counsel: "I have seen too many reports in the news where people were pleading insanity and they go to an insane asylum and then they get treatment and then they are out on the streets again." After this comment, the following occurred.
"[Defense counsel]: I think the Judge will charge you that in your deliberations on the guilt or innocence phase that you are not to consider what would happen in the event you returned a verdict of not guilty by reason of insanity. That's not for you to consider. Is there anyone who can put that out of their mind, or would you always be wondering six months from now will he be on the street like [L.M.] said? Is there anyone who cannot follow the Judge's instruction that `I don't have to think about that, I am not supposed to think about the consequences of the verdict if I find not guilty by reason of insanity?' Any one of you can put that out your mind?
"[L.M.]: I mean, if I went through the whole trial and saw all the evidence and everything, then I could make my decision then, whether it was to fry them or to let them go. I mean, once I make my decision I could live with it."
The trial court gave the following written jury instruction requested by the appellant:
"The defendant has raised as an affirmative defense that at the time[s] of the commission of the acts described in the indictment, he was suffering from a severe mental disease or defect and as a result of that disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. The defense of not guilty by reason of insanity is recognized in this state. Alabama Code (1975) § 13A-3-1 provides:
"`(a) It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
"`(b) "Severe mental disease or defect" does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.
"`(c) The defendant has the burden of proving the defense of insanity by clear and convincing evidence.'
"In your deliberations, you may not speculate [on] the consequence of a verdict of not guilty by reason of insanity. The matter will be dealt with by the court in *1316 subsequent proceedings not involving this jury."
(Emphasis added.)
That part of the trial court's instruction emphasized above is the portion the appellant complains of.
The appellant seeks a reversal because of an alleged error that he invited: the trial court's instruction that he now claims constituted error was specifically requested by him in writing. Moreover, he told the jury immediately after L.M. made her comments about an insanity defense that the trial court was going to so instruct them. Because the appellant requested this instruction, he did not object to the trial court's instructions on the grounds now raised. "A party cannot assume inconsistent positions at trial and on appeal, and a party cannot allege as error proceedings in the trial court that were invited by him or were a natural consequence of his own actions." Fountain v. State, 586 So.2d 277, 282 (Ala.Cr.App.1991). "The invited error rule has been applied equally in both capital cases and noncapital cases." Rogers v. State, 630 So.2d 78 (Ala. Cr.App.1991), rev'd on other grounds, 630 So.2d 88 (Ala.1992). "An invited error is waived, unless it rises to the level of plain error." Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991). If any error did indeed occur in the instant case, it did not rise to the level of plain error. However, we do not believe that error occurred here. The instructions to the jury were clear and understandable. The record supports our finding that L.M.'s comments under the circumstances here did not have an "unfair and chilling impact" on the jury's consideration of the appellant's insanity defense, as contended. Defense counsel, in effect, polled the venire on whether each veniremember could put aside L.M.'s comments and could follow the trial court's instruction subsequently suggested by defense counsel. We can legitimately assume from the absence of any response acknowledging any difficulty with L.M.'s comments or with any proposed jury instruction that no veniremember was prejudiced by L.M.'s comments. The record does not support a conclusion that the jury was affected by the comments of L.M., either separately or in conjunction with the trial court's instruction, in any manner. We certainly find no plain error here. In Gray v. State, 482 So.2d 1318 (Ala.Cr.App.1985), a similar situation arose. After the trial court had instructed the jury, but before it began its deliberations, a juror asked what would happen if the jury found the accused not guilty by reason of insanity. The trial court responded that it could not comment on the consequences of such a verdict and advised the jury not to speculate about the consequences because punishment was not in the jury's hands. We held in that case that the judge's comment did not have an unfair and chilling impact on the jury. In Gray, we held that "a judge should not leave the jury with `the impression that the defendant would be left to go free and unfettered if the jury determined him not guilty by reason of insanity.'" Id. at 1321 (quoting Hanes v. State, 56 Ala.App. 467, 469, 323 So.2d 118, 119 (1975)).

XIX.
The appellant contends that the trial court erred in granting the state's challenges for cause of veniremembers S.C. and M.A. based on their opposition to capital punishment. In the case of S.C., he argues that her responses to questions regarding capital punishment did not justify her removal for cause, and that it was improper for the trial court to excuse her without further questioning. In reference to M.A., he argues that it was improper to excuse him because he was never specifically asked whether he could set aside his personal views and impose the death penalty in accordance with his oath if he were properly instructed on the law.
The United States Supreme Court in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), set the early standard for a court's exclusion for cause of veniremembers who express an opposition to the death penalty. The Court, in dicta, limited exclusion for cause to those veniremembers who made it "unmistakably clear (1) that they would automatically vote against imposition of capital punishment ... or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Id. *1317 at 522-23 n. 21, 88 S.Ct. at 1777 n. 21. Subsequently, in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court modified its decision in Witherspoon, holding that the trial court may exclude veniremembers in capital cases whose views would "`prevent or substantially impair the performance of [his] duties as a juror in accordance with his instructions and oath.'" Id., at 424, 105 S.Ct. at 852 (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The Witt standard dispensed with the Witherspoon requirement of "automatic" decision making, and eliminated the requirement that a veniremember's bias be proved with "unmistakable clarity." 469 U.S. at 424, 105 S.Ct. at 852.
During the voir dire examination in the instant case, the record shows the following:
"THE COURT: ... Is there any juror who regardless of the facts he or she heard could under no circumstances whatsoever vote for the imposition of the death penalty?....
"[M.A.]: My name is [M.A.], and I don't believe in capital punishment.
"THE COURT: All right. So you are saying that under no circumstances, regardless of the evidence, would you be willing to vote for the imposition of the death penalty?
"[M.A.]: Yes, sir.
"THE COURT: Thank you. Anybody else? Yes, ma'am?
"[S.C.]: My name is [S.C.] and I was raised that God was the only one who could take a human life, so I never believed in capital punishment.
"THE COURT: Thank you for telling us, ma'am."
"MR. YELVERTON [defense counsel]: [M.A.], I think you were going to tell us earlier when the whole panel was gathered here that you work with some people from that area [where the crimes occurred]?
"[M.A.]: Yes, but basically, what they were telling me was basically what happened on the news. The biggest part was they know how I feel about things and they was just trying to convince me, you know, say he did it, he did it, he did it. And I just kept my conviction that, you know, I felt like, you know, I just don't believe in capital punishment.
"MR. YELVERTON: You want to go ahead and ask him?
"THE COURT: I don't think there is a whole lot [of] reason to go into what he knows or doesn't know. He thinks his capital punishment position would be enough to resolve the matter.
"MR. MADDEN [defense counsel]: Yes, sir. Could I ask a couple of questions about that position?
"THE COURT: Sure.
"MR. MADDEN: You have never served on a capital jury before, have you?
"[M.A.]: Not a capital jury.
"MR. MADDEN: So no one has ever asked you or stood up like they will and say put this man to death, or stand up like we will if it comes to that and say spare his life, right? You have never been in that position.
"....
"[M.A.]: No, I haven't.
"MR. MADDEN: All right. The law in this state is that the jury that considers penaltyassuming he is found guilty of a capital offense, the jury that decides penalty after aggravating factors and mitigating factors and then decides which is the right penalty. Do you understand that?
"[M.A.]: In a way. I understand you are asking me would that affect my decision?
"MR. MADDEN: And what I am saying is that are you telling us that you wouldn't listen to the evidence of aggravating and mitigating factors?
"[M.A.]: Yeah, I am trying to say I couldn't be fair about making a decision because I am already opinionated in the way I feel about that.
"MR. MADDEN: And nothing would change your mind no matter who the person was that was sitting before you?
"[M.A.]: No.

*1318 "MR. MADDEN: No matter what they did?
"[M.A.]: No. That's just the way I feel."
After reviewing the voir dire examination, we conclude that the trial court did not err in granting the challenges for cause as to S.C. and M.A. In the case of S.C., the trial court could have reasonably concludedwhen it assessed her comment "I was raised that God was the only one who could take a human life, so I never believed in capital punishment," along with her demeanor, the tone of her voice, and her appearancethat she meant that she believed unequivocally that she could not impose the death penalty regardless of the evidence presented or that her views would prevent or substantially impair the performance of her duties as a juror in accordance with the instructions of the court and her oath. See Watkins v. State, 509 So.2d 1071, 1073 (Ala. Cr.App.), aff'd on remand, 509 So.2d 1071 (Ala.Cr.App.1986), aff'd, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), and cases cited therein. In the case of [M.A.], the record shows that he made it unequivocally clear that he could not impose the death penalty under any circumstances. We find no error in the court's granting these challenges for cause.
While the trial court did not specifically ask each veniremember if the member could lay aside personal views and perform a juror's duties in accordance with the court's instructions and the juror's oath, the responses to the questions asked were sufficient for the trial court to reasonably conclude that a veniremember was unequivocally opposed to the death penalty or that the member's views would prevent or substantially impair the performance of his or her duties as a juror in accordance with the instructions of the trial court and the oaths as jurors.

XX.
The appellant contends that the exclusion of S.C. and M.A. from the venire because of their beliefs regarding the death penalty and because of the impairment that such beliefs would have on their ability to perform their duties as jurors violated his constitutional rights, both state and federal. He argues that the state did not have a legitimate interest in having them removed for cause and that their exclusion left him with a conviction-prone venire. He, in effect, is saying that death-qualifying a jury is unconstitutional. We find no merit in this contention. A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal or the state constitution prohibits the state from death-qualifying juries in capital cases. Id; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).

XXI.
The appellant contends that his surrender was not voluntary, and, therefore, that the trial court erroneously admitted the physical evidence seized at the time of his arrest and also erroneously admitted the testimony of his flight and surrender. First, we note that the circumstances of the appellant's surrender and arrest have no effect on the admissibility of the evidence of his flight.
The appellant did not object to the introduction into evidence of any evidence arising from his surrender and arrest. Therefore, we review under the plain error standard the question whether the evidence was admissible. The testimony clearly indicates that the appellant's arrest was legal: the police had probable cause to believe that he had committed very serious felonies. See C. Torcia, Wharton's Criminal Procedure, § 66 (13th ed. 1989). He does not argue on appeal that his arrest was illegal. The physical evidence that he now challenges was properly seized pursuant to a lawful arrest, and was, therefore, admissible. See Ex parte Hilley, 484 So.2d 485 (Ala.1985). Moreover, no facts available to the trial court when this physical evidence and any testimony as to his surrender were introduced would suggest *1319 any impropriety on the part of the police in securing the appellant's arrest and seizing the attendant physical evidence. Therefore, we can find no plain error in the admission of this evidence at trial.
Because the appellant raised this issue before the trial court in his motion for a new trial, we turn to the issue whether the trial court erred by denying the appellant a new trial on this ground. In support of his motion for a new trial, the appellant testified that a police officer told him, while negotiating the appellant's surrender, that an execution had not taken place in Alabama in "20 years." The appellant alleges that this statement lulled him into the erroneous assumption that he would not be charged with capital murder. If the officer made this statement, it was certainly known to the appellant at the time of trial; however, he chose to remain mute about this issue until after he was convicted. The record clearly indicates that the decision to say nothing about this alleged comment was a matter of trial strategy: defense counsel's opening argument at the guilt phase illustrated that the appellant was not coerced or induced into surrendering and that he was highly cooperative, and defense counsel directed his cross-examination of Officer Estes in a manner clearly calculated to show that the appellant's surrender was voluntary. We note that this strategypresenting the appellant as having acted with a clear conscience by voluntarily surrenderingwas consistent with the appellant's assertion that he did not remember the murders and it furthered his pursuit of mercy in the sentencing phases. We can find no error in the trial court's denial of the appellant's motion for a new trial on the grounds that the appellant had opted not to present evidence at trial that was inconsistent with his trial strategy. An unsuccessful trial strategy is not, without more, grounds for a new trial.
Moreover, the record shows that the appellant's surrender was not in fact coerced or induced by any statement by an officer or by any reasonable assumption the appellant may have made from any such statement. In his statement to the Mississippi police officers who arrested him, the appellant stated that when he left Hattiesburg he intended to surrender. Thus, he had clearly already decided to surrender before any contact with the police. In addition, the appellant's omission from his testimony at trial of involuntary surrender weighs against his dilatory assertion that his arrest was secured by coercion or inducement. We find no plain error in the trial court's admission of any evidence obtained pursuant to the appellant's arrest, and we further find no error in the trial court's denial of the appellant's motion for a new trial.

XXII.
The appellant contends that "the prosecution had a duty to correct the affirmative misrepresentation that no one has been executed in Alabama in the last 17 years, and, as [the] result of its failure to correct, Mr. Williams was denied the right to a fair and individualized sentencing." He argues that because of this alleged misrepresentation, he is entitled to a new trial. The appellant couches this issue in language that implies that the prosecution was responsible for injecting this information into the trial. This simply was not true. The appellant's trial counsel elicited this information from defense witness Ellzey on direct examination in the guilt phase of the trial. The record shows as follows:
"Q. [defense counsel]: Was there any discussion that day about a capital charge possibly pending against [the appellant]?
"A. [Ellzey]: Yes, I had asked [Officer Estes] and [Officer McRae], you know, what he was looking at if he came back. You know, my mind was just whirling with questions, and I asked them what ... was the penalty for this. And he said life without or the electric chair. And I asked [Office Estes] how long it had been since anybody in Alabama had been electrocuted, and he said that it had been well over 17, 16, 17 years, he said."
It is obvious that this response to defense counsel's question was anticipated. The appellant did not object to Ellzey's responses or move to exclude it; he offered no evidence to contradict the information the officer had given her; he asked for no clarifying jury *1320 instruction; and he failed to argue otherwise in his arguments to the jury in the sentencing phase. We review this issue under the plain error rule.
After reviewing the entire record of this trial and particularly the transcript of the jury's sentencing phase, while keeping the testimony objected to in proper context, we do not believe that Ellzey's statement repeating what the officer had said to her regarding the number of years since an execution had taken place in Alabama had any effect upon the jury, either in the guilt or sentencing phase of the trial. Under the circumstances presented here, to conclude otherwise would require us to resort to pure speculation. Again, the appellant seeks a reversal because of an alleged error that he invited. The appellant's contention that the jury did not have an appropriate awareness of its responsibility in recommending a sentence because, he argues, it had been in effect told that "any sentence of death would not be carried out," is not supported by the record. There is no plain error here.

XXIII.
The appellant contends that the one-count indictment charging him with the capital offense of murder committed during a robbery in the first degree, case number CC-92-1552, was duplicitous because, he says, it charged him with two separate offenses in the same count, i.e., robbery in the first degree and intentional murder. He argues that because of this alleged duplicity, he was denied due process of law. We note that the legal sufficiency of this indictment was never questioned in the trial court and is now raised for the first time on appeal. No motion to quash the indictment or for a bill of particulars was ever filed.
Duplicity in an indictment is the joinder of separate and distinct offenses in one and the same count. 42 C.J.S., Indictments and Informations § 148 (1991). Rule 13.3(a)(3) provides in, pertinent part, in addressing duplicity, "Two or more offenses shall not be joined in the same count." The indictment must allege all the elements of the offense charged and must also sufficiently apprise the accused of what he or she must be prepared to defend against. Breckenridge v. State, 628 So.2d 1012 (Ala.Cr.App. 1993); Ala.R.Cr.P. 13.2(a).
The questioned one-count indictment was not duplicitous. It did not allege two separate and distinct offenses, as contended by the appellant, but alleged one offense the capital offense of murder committed during a robbery in the first degree. It alleged all the elements of the capital offense charged, and was sufficiently definite to inform the appellant of the offense charged and of what he was called upon to defend. We find no merit in this contention. The indictment was legally sufficient.

XXIV.
The appellant contends that the indictments in cases CC-92-1552, charging the capital offenses of murder committed during the course of a robbery in the first degree, and CC-92-1553, charging the capital offense of murder of two or more persons by one act or pursuant to one scheme or course of conduct, were multiplicitous because, he says, they charged him twice for the intentional murders of Freddie Barber and Linda Barber. He also argues that his convictions on these charges violated his constitutional right not to be placed in jeopardy twice for the same offense because they arose out of the same incident, i.e., the killing of Freddie Barber and Linda Barber.
An indictment is multiplicitous if a single offense is alleged in more than one count, and the effect is to prejudice the jury by suggesting that more than one offense has been committed. 42 C.J.S., supra, § 160. In this case, the trial court, on motion of the state, consolidated the four indictments, including the two indictments under discussion here, for trial. As we hold in part XXV, infra, this consolidation was proper. In arguing multiplicity, the appellant is asking that we treat his indictments as one because they were consolidated. If we so treat them, the question becomes whether the two capital murder charges charged a single offense. This, in turn, brings us to the double jeopardy question.
*1321 In regard to the double jeopardy argument, one indictment charged the appellant with the intentional killing of four personsGerald Paravicini, Freddie Barber, Linda Barber, and Bryan Barber, a violation of § 13A-5-40(a)(10); and the other capital indictment charged him with the murder of Linda Barber and Freddie Barber during the course of a robbery in the first degree, a violation of § 13A-5-40(a)(2). Both indictments are based partly on the same act: the intentional killing of Linda and Freddie Barber. However, the test in determining whether the charges run afoul of the Double Jeopardy Clause is whether each crime contains a statutory element not contained in the other. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); See also United States v. Dixon, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (a plurality of the United States Supreme Court reaffirmed the Blockburger test as the sole criterion for judging double jeopardy claims); Seritt v. State, 647 So.2d 1 (Ala.Cr.App.), cert. denied, 647 So.2d 1 (Ala.Cr.App.1994). In this case, each capital offense charged required proof of an element that the other did not. Proof of the murder-robbery charge required proof of a robbery in the first degree, which the multiple murder charge did not require. Proof of the multiple murder charge required proof of more than one murder, which the capital murder offense of murder of two or more persons did not require. We therefore conclude that under the Blockburger test, the appellant was properly indicted and convicted for two separate and distinct capital offenses "notwithstanding a substantial overlap in the proof offered to establish the crimes," Iannelli v. United States, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975); Jackson v. State, 516 So.2d 726, 761 (Ala.Cr.App.1985), rem'd on other grounds, 516 So.2d 768 (Ala. 1986). Therefore, the charges were not multiplicitous and the appellant's convictions for both offenses did not violate the Double Jeopardy Clause.

XXV.
The appellant contends that the consolidation of the four indictments against himtwo charging capital murder and two charging attempted murder chargesprejudiced him because "a reasonable juror would have viewed the multiple charges as evidence that compounded [his] guilt, enhanced his culpability, and warranted extra punishment."
Consolidation of similar offenses is specifically provided for in Rule 13.3(a)(1), (2), and (3) and Rule 13.3(c), Ala.R.Cr.P. If offenses are charged in separate indictments, which was the case here, the trial court, on its own or on motion of either party, may order that the charges be tried together, if the offenses could have been joined in a single indictment. Rule 13.3(c). Two or more offenses may be joined in an indictment if they are of the same or similar character or are based on the same conduct or are otherwise connected in their commission, or are alleged to have been part of a common scheme or plan. Rule 13.3(a). Rule 13.3 does not exclude the consolidation of a capital offense with another lesser offense. George v. State, [CR-94-387, April 19, 1996] ___ So.2d ___ (Ala.Cr.App.1996).
The appellant inappropriately relies on Jenkins v. State, 472 So.2d 1128 (Ala.Cr. App.), cert. denied, 472 So.2d 1128 (Ala.Cr. App.1985). In that case, the consolidation of the charges of second-degree rape and indecent exposure with a charge of first-degree rape was held to be improper because "[n]one of the evidence in one case overlapped with that in another case." In this case, evidence in the two capital cases and the two attempted murder cases overlapped, and the offenses were of the same or similar character, were connected in their commission, and were part of a common scheme or plan. See Knotts v. State, 686 So.2d 431 (Ala.Cr.App.1995).
The appellant has failed to demonstrate the "actual and compelling" prejudice necessary to outweigh the benefits of judicial economy resulting from consolidation. See Ex parte Hinton, 548 So.2d 562 (Ala.), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). The trial court did not abuse its discretion in consolidating the appellant's indictments for trial.

*1322 XXVI.
The appellant contends that the trial court erred in not ordering sua sponte a change of venue because of alleged pretrial publicity. He argues that the media coverage of the case so saturated the community that "it was probable that he could not receive a fair trial." We examine this issue under the plain error standard because it was not timely raised in the trial court. It was raised for the first time in a motion for a new trial. In support of this allegation in his motion for a new trial, the appellant introduced numerous newspaper articles from local newspapers and transcripts of newscasts by local television stations covering the case from its inception through the trial, including information as to the area covered by the media.
Media publicity can prejudice prospective jurors and thereby result in a denial of an accused's right to an impartial jury. Chandler v. Florida, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), the Alabama Supreme Court held:
"Absent a showing of abuse of discretion, a trial court's ruling on a motion for a change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Cr.App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Cr.App.1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, [1642-43], 6 L.Ed.2d 751 (1961):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, [2035-36], 44 L.Ed.2d 589 (1975). Thus, `the proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Cr.App.1978)."
Just prior to the commencement of the voir dire examination in this case, the appellant moved the trial court to examine each veniremember separately to explore each veniremember's exposure to pretrial publicity and his or her views on "mental health issues" and capital punishment. His purpose was to obtain information for challenges for cause and for the exercise of his peremptory strikes. He did not move for a change of venue nor did he mention the subject to the trial court until he filed his motion for a new trial. The trial court refused to permit individual voir dire of all veniremembers, but stated that it would permit extensive voir dire by the parties and individual voir dire examination if any veniremember professed to have any knowledge other than that that had already appeared in the media. The trial court first asked the veniremembers, as a group, if any had any personal knowledge of the case other than knowledge obtained from the media. Four indicated that they did, and after questioning, three were excused for cause, two on motion of the appellant and one on motion of the state. The trial court then addressed the remainder of the venire as follows:
"Now ... I would assume that many or most of you have had at least some exposure to the charges in the case through the media. Is there anyone who does not feel that they could try the case fairly and impartially and on the basis of the testimony they hear here in court as opposed to *1323 what they may have heard or seen or read through the media?
"(No response.)"
Thereafter, defense counsel asked the veniremembers if they had seen and/or heard on television, on radio, or in the newspapers anything concerning this case. Twenty-one indicated that they had not read, heard, or seen anything about the case. Of the remaining 39 who indicated that they had been exposed to some information about the case through the media, an extensive individual voir dire examination was conducted in panels of six and of nine members. With the exception of one veniremember, who was ultimately excused for cause on motion of the appellant, the veniremembers' recollections of what they had read, heard, or seen was brief and sketchy, and they stated or acknowledged that they could lay aside anything that they had read or heard about the case and render a fair and impartial verdict based solely upon the evidence presented in court.
We have examined the media materials presented to the trial court, and conclude that it did not contain inherently prejudicial information. Moreover, the voir dire examination clearly showed that no veniremember remaining on the venire was prejudiced against the appellant as a result of pretrial publicity. The voir dire showed that the veniremembers had no fixed opinions at the time of trial. In addition, the media material does not support a conclusion that the community was saturated with prejudicial pretrial publicity. The media coverage was not of such magnitude as to raise a presumption of prejudice. The veniremembers, who were on the strike list compiled by the trial court after the voir dire examination and challenges for cause, were competent to try the appellant. The failure of the trial court to order a change of venue sua sponte was not plain error. Indeed, under the facts presented, the trial court would not have abused its discretion in denying a motion for change of venue, had one been filed.

XXVII.
The appellant alleges that the trial court's failure to sua sponte excuse veniremember A.D. constituted prejudicial error because, he argues, A.D. was biased by the news coverage concerning the offenses that she had followed because she lived close to the area where the crimes occurred. The appellant did not challenge A.D. for cause; thus, we must review this issue for plain error.
The individual voir dire examination of veniremember A.D. while on a small panel is as follows:
"Q. [defense counsel]: [C]ould you tell us, please, where or what your source of information was, please?
"A. [A.D.] In the local news and newspaper.
"Q. Was thatand people that talked about it with?
"A. Local newspaper and local TV stations.
"Q. Okay. Would that have been at the time, like, say, following the incident itself?
"A. The very next day.
"Q. Was it something that you followed with some sort of keen interest ...
"A. At the time, yes, because I live in Theodore and that was close. Too close.
"Q. Did you [know] any of these people? I am sure you have heard that question.
"A. No, I did not know any of them personally.
"Q. Did you discuss it with any members of your family, friends or anything?
"A. Husband and children, yes.
"Q. Did you formy'all form some consensus on
"A. No, we just discussed the news, the facts that were printed.
"Q. [A.D], when you say `This was close. It was too close,' did y'all do anything to prevent something like that fromlike, say, for instance, going out and purchasing yourself a burglar alarm system or anything?
"A. We have had such for some time. We have a security system and Doberman [dog] and so forth.
"Q. And a Doberman?

*1324 "A. Um-hum, but she will lick you to death.
"Q. She will lick you to death. I don't have any further questions."
A.D.'s answers to the above questions do not suggest that she might have been improperly influenced by what she had seen or heard in the news media or by discussions with her family. In fact, the record indicates that she had not formed any opinion regarding the crimes. There is nothing to indicate that she might not have been impartial or that she would not have followed the trial court's instructions. We note that A.D. did not serve on the jury. We find no plain error, either on statutory or common law grounds, in the trial court's failure to sua sponte remove A.D. from the venire. Smith v. State, 581 So.2d 497, 503 (Ala.Cr.App. 1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991). ("The party seeking to challenge a juror for cause must show that the questioned juror is due to be struck under § 12-16-150, Code of Alabama 1975, or on common law grounds. See Kinder v. State, 515 So.2d 55, 60 (Ala.Cr.App.1986).")

XXVIII.
The appellant contends that the failure of the trial court to sua sponte excuse veniremember A.L. from the venire denied him the right to strike a jury from an unbiased venire. He bases this contention on the A.L.'s responses on voir dire that she had "one foot already over" on a verdict of guilt, and "one foot already over" on a sentence of death. The appellant did not challenge for cause this veniremember. Thus, the issue is reviewable under the plain error standard. The record shows the following pertinent voir dire examination of A.L.:
"MR. YELVERTON [defense counsel]:... [H]ave you formulated any opinion about this case or about [the appellant] as a result of [a possible discussion in your business law class]?
"[A.L.]: In all honesty, I would probably say yes.
"MR. YELVERTON: Would you share that with us, please?
"[A.L.]: I mean, murder is murder, to me. I formed an opinion on that, first of all, you know. Andbut when you talk about capital punishment, I can't really say that I could say to kill a person that murdered someone, you know, even if there is a shadow of a doubt, or ever really say that because I'm not God. I couldn't say that I could. But then, again, I might be able to.
"MR. YELVERTON: Do you have any more questions?
"MR. MADDEN [defense counsel]: You have never been put in this position before, right?
"[A.L.]: Right.
"MR. MADDEN: Of having to decide. You would listen to what the Judge told you the law was pretty closely, right?
"[A.L.]: I can't say that either. I mean, I am not saying that I wouldn't listen to the Judge, but I am a strong-minded person and I have my own beliefs. I can say that. Regardless of what anybody else say, my beliefs are my beliefs.
"MR. MADDEN: All right. But you are not saying that you would automatically vote either for or against the electric chair, but you would want to hear a[ll] the evidence and listen to what the law was?
"[A.L.]: I can't say that. I really honestly can't say that because I canin all honesty, I can look at a person and form an opinion.
"MR. MADDEN: Well, we are all like this. What is your opinion? I mean, do you sit here with a fixed opinion as to what you would do if you were actually picked as a juror and had to decide, or would you wait to hear everything?
"[A.L.]: Let's just say I got one foot already over. Now, it could be brought back out, but it may not be brought back out.
"MR. MADDEN: Which way is it over?
"[A.L.]: Just from the newspaper and stuff it was already guilty.
"MR. MADDEN: What about the punishment part?
"[A.L.]: If I was to say that it was no shadow of a doubt, I would probably say murderyou know, to electrocute him, but then I couldn't really say.

*1325 "MR. MADDEN: So your mind isn't made up on that one, yet?
"[A.L.]: Not on that part."
The appellant was not prejudiced in any way by the trial court's failure to sua sponte excuse A.L. from the venire. He did not use a peremptory strike to remove her, but allowed her to remain as an alternate on the jury. We believe this was calculated trial strategy. Moreover, she was excused before the jury began deliberating, and, thus, did not participate in the deliberations which led to the verdicts. Hunter v. State, 585 So.2d 220 (Ala.Cr.App.1991), relied upon by the appellant to support his argument, is distinguishable from this case. Hunter involved an erroneous denial by the trial court of a challenge for cause, which forced the defendant in that case to use a peremptory strike to correct the court's error. The trial court's failure to sua sponte excuse A.L. from the venire for cause was not plain error.

XXIX.
The appellant contends that the prosecutor and the trial court violated Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), by informing the jury that a conviction for capital murder would carry a punishment of either life imprisonment without parole or death, and that the jury would be required to determine the appropriate sentence. Immediately following the administering of the oath to the venire, the trial court informed the veniremembers that if the appellant was found guilty of capital murder, "then it [would] be the job of the jury to determine whether the appropriate punishment in the case is life in prison without parole or death by electrocution." Immediately after the jury was sworn, the prosecutor, in his opening statement, informed the jurors that a conviction for capital murder "would carry a punishment of either life in the penitentiary without parole or death by electrocution." The appellant argues that it is inappropriate for a jury to be considering punishment issues during guilt-phase deliberations, and that such a practice "relieves the state of its burden of proving every element of the offenses beyond a reasonable doubt." Again, no objection was made in the trial court to these comments; therefore, we review this issue under the plain error rule.
Caldwell v. Mississippi held that it is constitutionally impermissible to rest a death sentence on a determination by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere. In the instant case, the comments of the trial court and the prosecutor were intended to inform the veniremembers and the jurors of the nature of the case about to be tried and the general procedures that would be followed. It is not error for the trial court to instruct the jury as to its role in the sentencing process. See e.g., Ex parte Hays, 518 So.2d 768 (Ala.1986), cert. denied, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988); Kuenzel v. State, 577 So.2d 474 (Ala. Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Martin v. State, 548 So.2d 496, 499 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). The comments did not diminish or detract from the jury's role and responsibility in the proceedings. The jurors could not have reasonably interpreted the comments to mean that the state was relieved of its burden to prove every element of the offenses charged beyond a reasonable doubt, as the appellant contends. We find no error in the proceedings in reference to the comments referred to above, and certainly no plain error.

XXX.
The appellant contends that the statutory scheme in Alabama regarding the insanity defense violates his constitutional rights because, he says, it does not provide for (1) the doctrine of diminished capacity; (2) the alternative verdict of "guilty but mentally insane"; or (3) the alternative verdict of guilty but mentally ill. He relies on Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and Wiggerfall v. Jones, 918 F.2d 1544 (11th Cir.1990), to support his assertions.
A verdict finding the accused guilty but insane or using similar language has the effect of a finding that the defendant is not criminally responsible for the acts committed. *1326 "Guilty But Mentally Ill," 71 A.L.R. 4th 702, 705 (1989). In other words, it has the same effect as a verdict of not guilty by reason of insanity or mental disease or defect. See § 13A-3-1; § 15-16-1.
A number of states have enacted statutes providing for a verdict of guilty but mentally ill. These statutes are intended to provide a classification whereby a defendant bears the legal responsibility for criminal conduct, but is treated for mental illness while incarcerated. People v. Jackson, 80 Mich.App. 244, 263 N.W.2d 44 (1977). The Alabama statutes and the Alabama Rules of Criminal Procedure do not provide for that type of verdict. The approach to the insanity defense in this state is sometimes referred to as the "all or nothing approach." Hill v. State, 507 So.2d 554, 556 (Ala.Cr.App.1986), cert. denied, 507 So.2d 558 (Ala.1987). Under this approach, either a defendant must establish insanity as a complete defense to or excuse for the crime, or must be held fully responsible for the crime charged. Barnett v. State, 540 So.2d 810 (Ala.Cr.App.1988). If a defendant is found not guilty in this state by reason of mental disease or defect, the statutes and rules provide commitment and treatment. § 15-16-41, et seq.; Ala.R.Cr.P. 25.
As we held in part XIII, supra, Alabama's express rejection of the doctrine of diminished capacity has been upheld against constitutional challenges. Barnett v. State; Hill v. State. We further hold that our statute providing for the defense of mental disease or defect is not rendered constitutionally deficient for its failure to provide for alternative verdicts of "guilty but mentally insane" or guilty but mentally ill. The cases relied upon by the appellant, Beck and Wiggerfall, are distinguishable from the instant case and do not apply here. In those cases, the courts held that a death sentence may not be constitutionally imposed after a jury verdict of guilty of a capital offense where the jury was not permitted to consider a verdict of guilty of a lesser included offense and the evidence would have supported such a verdict. It appears that the appellant is arguing for changes in the law and in public policy that do not lie within the province of the courts in this instance, but that would be better addressed by the legislature.

XXXI.
Contrary to the appellant's contention, the photographs of the bodies of the victims, taken at the scenes of the crimes and during the autopsies, were properly admitted into evidence. "The gruesome or inflammatory nature of a photograph is not grounds for exclusion, where it has a reasonable tendency to prove or disprove some material fact in issue, or which may be in dispute or material." Braswell v. State, 371 So.2d 992, 998 (Ala.Cr.App.1979). The photographs tended to refute the appellant's defense that he committed the crimes out of insane delusion, i.e., they showed that the victims were shot with deliberate precision in the head and neck areas. The photographs were also admissible to corroborate the testimony of the forensic pathologist, Dr. Gregory Wanger. Palmore v. State, 283 Ala. 501, 218 So.2d 830 (1969); Grant v. State, 250 Ala. 164, 33 So.2d 466 (1948).

XXXII.
The appellant contends that he was denied due process of law because, he says, the trial court permitted the state to introduce cumulative, irrelevant, and highly prejudicial evidence. He argues that this was done to "overwhelm" him and to inflame the passions of the jury. In support of his contention, the appellant specifically refers to the introduction of several photographs of the bodies of the victims, the testimony of a pathologist concerning the causes of death of the victims and the causes of the wounds on their bodies, the testimony of a fingerprint expert identifying a fingerprint of the appellant found on a road atlas in the Barbers' van, and the testimony of a ballistics expert that all of the spent bullets and cartridges recovered were fired from the same rifle.
After reviewing the evidence complained of, we conclude that it was neither cumulative, irrelevant, nor highly prejudicial, but that it was relevant and probative of material issues in the case. The record does not support a conclusion that the evidence was offered by the state for the purpose of overwhelming *1327 the appellant or inciting the jurors' passions. We find nothing more than an attempt by the state to prove the offenses charged beyond a reasonable doubt. The appellant correctly points out that most of the state's evidence was uncontested; however, even though the appellant did not contest it, neither did he admit it. In this posture, the state had the burden of proving every element of the offenses charged, and it should not now be faulted for doing so. We find no plain error or due process violation here.
Even if we assume for the sake of argument that some of the evidence was cumulative and that it was offered to prove undisputed facts, there still would be no error in this case, much less plain error, because the admission of the evidence was clearly within the trial court's discretion, and its admission did not injuriously affect a substantial right of the appellant.
It is within the trial court's discretion to exclude cumulative evidence. Lewis v. State, 414 So.2d 470 (Ala.Cr.App.1982); C. Gamble, supra, § 10.07. The admission of cumulative evidence, however, even upon an undisputed fact, is not prejudicial error. Woods v. State, 460 So.2d 291 (Ala.Cr.App.1984); Ala. R.App.P. 45; C. Gamble, supra, § 10.07.

XXXIII.
The appellant contends that the trial court erred by overruling his objection to a question asked of defense witness G.R. by the prosecutor on cross-examination as to whether he had ever used illegal drugs. The record shows the following:
"Q. [Prosecutor]: Did you ever take any of these drugs?
"A. [G.R.]: No.
"Q. Not just LSD. Have you ever consumed any chemical substance, the consumption of which is a violation of the law?
"MR. YELVERTON [defense counsel]: I object, Judge.
"THE COURT: Is this offered to test the witness's familiarity with the symptoms of persons on such substances?
"MR. GALANOS: It is.
"THE COURT: Overruled.
"A. No, I haven't.
"Q. So when you saw folks that you thought were under the influence of LSD how did you know that it was LSD as opposed to something else?
"A. Because usually Iusually it would be someone that I knew and they would tell me what they were on, or if I didn't know them, then I couldn't really be sure. But usually, I mean, I have seen friends of mine that were on different drugs, told me what it was and I saw the effects that it had on them.
"Q. Just your friend but never you?
"A. No, I am afraid not."
The witness had testified on direct examination that he was working at the Top Gun Club, a bar, on the night before the crimes were committed; that he first observed the appellant at the club around 11:30 p.m.; that the appellant left the club around 1:00 a.m. and returned about 45 minutes later; that when he returned his shirt was unbuttoned, he was sweating profusely, he was dancing although there was no music playing, and he stared at the wall for about thirty seconds; and that he appeared to have taken LSD. The witness's testimony was offered by the appellant and it was highly relevant to his defense that he was legally insane and suffering from a mental disease or defect at the time the crimes were committed resulting from a combination of his mental condition and the ingestion of drugs, including LSD.
A party is given wide latitude on cross-examination to test a witness's partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness's testimony or recollection as well as the extent of his knowledge. Wells v. State, 292 Ala. 256, 292 So.2d 471 (1973); Housing Authority of City of Decatur v. Decatur Land Co., 258 Ala. 607, 64 So.2d 594 (1953); Hooper v. State, 585 So.2d 142 (Ala. Cr.App.1991), cert. denied, 503 U.S. 920, 112 S.Ct. 1295, 117 L.Ed.2d 517 (1992); C. Gamble, supra, § 136.01. The range of cross-examination rests largely in the discretion of the trial court, and that court's ruling will not be disturbed unless it clearly appears that *1328 the defendant was prejudiced by the ruling. Hooper v. State, However, "where the witness' testimony is important to the determination of the issues being tried, there is little, if any, discretion in the trial court to disallow cross-examination. Wells v. State, 292 Ala. at 258, 292 So.2d at 473.
Section 135.01 of McElroy's Alabama Evidence provides, in pertinent part, as follows:
"It has been said that the cross-examining party has the absolute right on cross-examination, not only to inquire as to matters relevant to the issues under the pleadings, but also to inquire into the conduct and circumstances of the witness which have measurable bearing upon his credibility. This right to a party to have thorough and sifting cross-examination is provided by statute.
"The trial court has the discretion reasonably to limit the range of cross-examination in respect to collateral and irrelevant matters or with respect to matters that unnecessarily consume time in the trial of the case....
"The control of examination, therefore, is within the discretion of the trial judge, but it is only after a party has had an opportunity substantially to exercise the right of cross-examination that the discretion becomes operative. When the question does not call for collateral or irrelevant matters, the action of the trial court in sustaining an objection to the question cannot be rested on an exercise of discretion on the part of the trial court to limit cross-examination."
In this case, the testimony of the witness that the appellant was on drugs or LSD was important to the determination of a key issue in the case, and the state had the right to cross-examine him to test the accuracy of his testimony and the extent of his knowledge. The source or scope of his knowledge of how someone looked and acted while on drugs, particularly LSD, was a legitimate area of inquiry for cross-examination. Whether he had personal experience with observing persons on drugs, including LSD, or had experienced the effects of drugs himself would have measurable bearing upon his credibility. The trial court correctly overruled the appellant's objection to the questions asked on cross-examination in this case.

XXXIV.
The appellant contends that it was error for the prosecutor to comment upon and the trial court to allow testimony regarding the appellant's assaults upon Clair Paravicini and Buford Billedeaua. The appellant raises this issue for the first time on appeal.
"`Evidence of the accused's commission of another crime is admissible if such other crime is inseparably connected with or is a part of the res gestae of the now-charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence.' C. Gamble, McElroy's Alabama Evidence (3d ed. 1977), § 69.01(3). See also Orr v. State, 462 So.2d 1013, 1015 (Ala.Cr.App.1984). `Evidence of other crimes is properly admissible as part of the res gestae if all of the criminal acts are part of one continuous criminal adventure by the same party occurring within a matter of hours. Miller v. State, 405 So.2d 41 (Ala.Crim.App.1981). See also Moseley v. State, 357 So.2d 390 (Ala.Crim.App.1978); Summers v. State, 348 So.2d 1126 (Ala. Crim.App.), cert. denied, 348 So.2d 1136 (Ala.1977).' Pettaway v. State, 494 So.2d 884, 886 (Ala.Cr.App.1986). In the present case, this evidence `was intimately connected with the same transaction which is the basis of the State's case.... The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge.' Blanco v. State, 515 So.2d 115, 120 (Ala.Cr.App.1987) and cases cited therein. `The trial court did not err in overruling appellant's objection to the admission of such evidence. No matter how many distinct crimes may be involved, all the details of one continuous criminal occurrence or adventure may be given as part of the offense with which the defendant is charged.' Coleman v. State, 487 So.2d 1380, 1385 (Ala.Cr.App.1986) and cases cited therein." *1329 Rowell v. State, 570 So.2d 848, 852 (Ala.Cr. App.1990). The appellant's assaults upon Paravicini and Billedeaua were clearly a part of the one continuous criminal adventure that resulted in the killings at issue here and were intimately connected with the crimes with which the appellant was charged. We find no error in the admission of evidence of those crimes, much less plain error.

XXXV.
The appellant contends that the state failed to rebut the presumption that his statements to Dr. McClaren were involuntary and failed to establish that the appellant had been advised of his rights, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and thus the admission of Dr. McClaren's testimony in rebuttal at the guilt phase of this trial was erroneous. He further contends that the state failed to establish that he had waived his right to have counsel present at Dr. McClaren's evaluation. He relies upon Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), to support his contention. No objection was made to Dr. McClaren's testimony at trial, and thus, we review this issue under the plain error rule.
As we have previously noted in part V of this opinion, the appellant advised the trial court at arraignment that he intended to present an insanity defense. The appellant's counsel made arrangements for him to be examined by Dr. Brown at state expense, and the state was furnished a copy of Dr. Brown's findings. Dr. Brown testified for the appellant in the guilt phase of the trial, giving his opinion that, at the time the offenses were committed, the appellant was suffering from a "mental disease or defect," and as a result was "unable to appreciate the nature and quality or wrongfulness of his acts." The state presented Dr. McClaren in rebuttal, who testified that the appellant suffered from a "personality disorder" and that, while he may have been intoxicated from various substances at the time of the commission of the offenses, he had the ability to appreciate what he was doing, he understood what he was doing, and he realized the wrongfulness of his acts.
We find no merit, much less plain error, in the appellant's contention that his Fifth Amendment right was violated by the admission of Dr. McClaren's testimony in the state's rebuttal. As noted in part V of this opinion, by actively pursuing an insanity defense and introducing testimony of qualified psychologists or psychiatrists as defense witnesses, a defendant waives any privilege against self-incrimination the defendant may have had against subsequent qualified testimony or rebuttal. McWilliams v. State; 640 So.2d 982 (Ala.Cr.App.1991), aff'd in part, rem'd in part on other grounds, 640 So.2d 1015 (Ala.1993), aff'd in part, rem'd in part on other grounds, 640 So.2d 1025 (Ala.Cr. App.1994); Salmon v. State, 460 So.2d 334 (Ala.Cr.App.1984); Magwood v. State, 426 So.2d 918 (Ala.Cr.App.1982), aff'd, 426 So.2d 929 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). See also Buchanan v. Kentucky, 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). In addressing a similar issue in Hargrave v. Wainwright, 804 F.2d 1182, 1192 (11th Cir. 1986), the United States Court of Appeals of the Eleventh Circuit stated:
"[P]etitioner in the present case chose to bring psychiatric evidence to the jury's attention and cannot now complain because the State attempted to counter his argument with evidence of its own. Just as a defendant cannot take the stand and lie, secure in the knowledge that his prior confession will be excluded solely because he had not received Miranda warnings, see Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), we find nothing in the Constitution that prohibits the State from introducing psychological opinions based on statements a defendant has given in the absence of Miranda warnings when the defendant himself plans to make his mental abilities an issue."
We further find that the record does not support the appellant's assertion that his interview with Dr. McClaren was involuntary. Thus, there is no error, much less plain error in this regard. We also find no merit in the appellant's contention that his Sixth Amendment right was violated by the admission of *1330 Dr. McClaren's testimony in the state's rebuttal.
In Buchanan v. Kentucky, 483 U.S. at 425, 107 S.Ct. at 2919, the Supreme Court held that the introduction of a psychiatric report by the state did not violate a defendant's Sixth Amendment right to assistance of counsel, because defense counsel surely knew that counsel intended to present a "mental status" defense for the defendant and would therefore have had to have anticipated the use of psychological evidence by the prosecution on rebuttal. In this case, the appellant, through counsel, put the state and the trial court on notice well before trial that he would pursue an insanity defense, selected his expert to conduct his mental examination, agreed to furnish the state a copy of the findings, and agreed to be examined by the state's expert if the need arose. He, with the advice of counsel, fully agreed with the procedures to be followed, and had every opportunity to consult with his counsel and have them present at his examinations. Under the circumstances here, it can be reasonably be assumed that counsel consulted with the appellant concerning the psychiatric examination with the state's expert.
Estelle v. Smith, upon which the appellant relies, is clearly distinguishable. In that case, the trial court had ordered, sua sponte, a psychiatric examination when the defendant had neither asserted an insanity defense nor offered any psychiatric evidence at trial.
There is no error here.

XXXVI.
The appellant contends that the trial court denied him "due process, equal protection and a fair trial by violating the independence of the defense expert, Dr. Brown, and interfering with the attorney-client relationship." He argues that the psychiatric assistance provided him was inadequate under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), because Dr. Brown's reports were made available to the state. The appellant did not object at trial on the basis he now raises and, therefore, we review this issue under the plain error rule.
The requirements of Ake v. Oklahoma were fully met in this case. The appellant was furnished competent psychiatric assistance, which enabled him to fully present his insanity defense to the jury. The requirement that the defense furnish the state a copy of the findings of the appellant's psychiatric expert before trial was proper and necessary under Rule 16.2(c), Ala.R.Cr.P. The appellant's contention is without merit. We find no violation of the appellant's due process or equal protection rights. The record fails to support the appellant's allegations that the trial court or the state interfered with his expert, Dr. Brown, or that, under the circumstances of this case, the attorney-client relationship was interfered with. We find no plain error here.

XXXVII.
The appellant contends that the trial court erred by ruling that Ellzey's testimony regarding the appellant's statements to her in one of their telephone conversations the day after the crimes were committed was hearsay, and, consequently, by limiting the purposes for which the jury could consider that testimony. Specifically, he contends that the trial court erroneously instructed the jury not to accept these statements as proof that the facts asserted in the statements were true. The trial court instructed the jury regarding Ellzey's testimony as follows:
"[T]he defense is offering the testimony of this lady as to what her conversation with the defendant was for the purpose of attempting to show what the defendant's mental state was at that time. You are not to consider this testimony as in any way proving what either of them said was true. It is simply offered for the purpose of showing what was said. Its truth or nontruth is not material for our purposes here. So you are just going to get to hear what they said, and you are not going to assume that the facts of the matters stated in that conversation were true."
Ellzey then testified that during that telephone conversation the appellant told her that he did not know that Paravicini had been murdered the day before and that he did not know what had happened. Ellzey *1331 further testified that the appellant appeared to be calm and sober during this conversation. The appellant did not object to this ruling at trial. Therefore, our review is under the plain error rule.
The appellant contends that Ellzey's testimony was not hearsay, because, he says, the testimony was offered as proof of the appellant's state of mind. Testimony is not hearsay if it is offered to show the declarant's state of mind at the time of his extrajudicial statements, rather than offered for the truth of the matters asserted therein. See C. Gamble, McElroy's Alabama Evidence, § 242.01(1)(c)(3).[10] It follows that evidence of a defendant's extrajudicial statements offered to show that person's state of mind at the time the statements were made is inadmissible as proof of the truth of the matters asserted unless one of the exceptions to the general hearsay exclusionary rule applies. Id.
Ellzey's testimony illustrates the fact that the same statement may be hearsay when offered for one purpose but may not be hearsay when offered for another purpose. If offered to provide circumstantial evidence of the appellant's mental state at the time of the statements, this testimony is not hearsay. However, if offered to prove that the appellant could not in fact remember that he killed Paravicini, this testimony is hearsay, because it is then being offered to prove the truth of the matters asserted in the extrajudicial statements. In this case, Ellzey's testimony was offered to prove only that the appellant in fact made these statements. The jury was entitled to infer the appellant's state of mind from the fact that he made these statements and from the circumstances under which he made them.
The appellant, however, contends that Ellzey's testimony was also admissible to prove the truth of the matters asserted in the appellant's statements to Ellzey under an exception to the general hearsay exclusionary rule, which exception he fails to specify. We conclude, however, that no such exception exists in this case. The statements the appellant made to Ellzey were self-serving statements made one day after the offenses. They were not part of the res gestae and were not introduced by the state. Therefore, to the extent that they were offered for the truth of the matters asserted therein, these statements constituted inadmissible hearsay. See Smitherman v. State, 627 So.2d 1116 (Ala.Cr.App.1993). Accordingly, we find no plain error in the trial court's instructions to the jury limiting the purposes for which this testimony could be used.
Moreover, the appellant's claim of prejudice fails. The record shows that the appellant testified that on February 16, 1992, he could not in fact remember what had happened on the previous day, and that he first learned about Paravicini's murder through his telephone conversation with Ellzey. His psychiatric expert corroborated those statements. The trial court allowed the jury to consider the testimony of these two witnesses as direct evidence of the assertion that the appellant did not remember Paravicini's murder. Therefore, the appellant was not denied the opportunity to present evidence in his defense. We find no plain error here.

XXXVIII.
The appellant contends that it was error for the trial court to instruct the jury that "[t]he degree of intoxication necessary to negate specific intent and thus reduce the charge must amount to insanity." He argues that that instruction deprived him of the diminished capacity defense. We review this issue under the plain error standard because it was not presented to the trial court. As we noted in part XIII of this opinion, Alabama *1332 has expressly repudiated the diminished capacity doctrine. Moreover, the trial court's instruction quoted above was proper.
"Bankhead contends that the court's instruction requiring that the jury, in order to find a drunkenness defense applicable, had to find Bankhead insane due to intoxication, was prejudicial. We disagree. In an assault and battery case, voluntary intoxication is no defense, unless the degree of intoxication amounts to insanity and renders the accused incapable of forming an intent to injure. Lister v. State, 437 So.2d 622 (Ala.Cr.App.1983). The same standard is applicable in homicide cases. Crosslin [v. State, 446 So.2d 675 (Ala.Cr. App.1983), appeal after remand, 489 So.2d 680 (Ala.Cr.App.1986)]. Although intoxication in itself does not constitute a mental disease or defect within the meaning of § 13A-3-1, Code of Alabama 1975, intoxication does include a disturbance of mental or physical capacities resulting from the introduction of any substance into the body. § 13A-3-2. The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. A jury is capable of determining whether a defendant's intoxication rendered it impossible for the defendant to form a particular mental state."
Ex parte Bankhead, 585 So.2d 112, 121 (Ala. 1991).

XXXIX.
The appellant contends that, during the guilt phase, the trial court erred by failing to timely instruct the jury that the statutory presumption of sanity is rebuttable. At the charge conference before the court's oral charge, the appellant requested that the trial court instruct the jury that a defendant may rebut the statutory presumption of sanity with clear and convincing evidence. The trial court agreed to give this jury charge and directed defense counsel to write it on the trial court's written instructions to be used in charging the jury. However, defense counsel failed to write the charge down as instructed. Consequently, the trial court initially failed to include the specific language requested by defense counsel in its oral charge. Rather the court instructed the jury, in pertinent part, as follows:
"The defendant has the burden of proving the defense of insanity by clear and convincing evidence.... By entering this plea or offering evidence in testimony thereof the defendant does not forego the presumption of innocence and does not waive his general plea of not guilty, but the burden is on the defendant to establish and prove the legal defense of insanity by clear and convincing evidence. By law every person over the age of fourteen is presumed to be responsible for his or her acts. That is to say that every person over that age is presumed to have sufficient mental capacity to appreciate that certain types of conduct are criminal. Thus this presumption is a fact in the case which must be considered by the jury along with all the evidence. In applying these propositions you must consider all the evidence in determining the question of insanity at the time of the commission of the alleged crimes.... If the defendant has proved by clear and convincing evidence that he was in fact insane at the time of the commission of the offense, then it would be your duty to find him not guilty by reason of a mental disease or defect."
We find that although the court did not use the specific words requested by defense counsel, the substance of this jury charge was that the appellant could rebut the presumption of sanity with clear and convincing evidence that he was insane at the time the offenses were committed.
At the conclusion of the trial court's oral charge, and before the jury began deliberating, the trial court gave the parties an opportunity for objections outside the presence of the jury. During that colloquy, defense counsel indicated that the trial court had failed to instruct the jury, in the specific language requested, that the presumption of sanity may be rebutted by clear and convincing evidence to the contrary. The trial court agreed, and recalled the jury to the courtroom for further instructions. During this supplemental jury charge, the trial court instructed *1333 the jury as to three brief points of law, including:
"Finally, I have been asked to tell you that with regard to the presumption that all persons are sane, that presumption may be rebutted if the defendant presents clear and convincing evidence which satisfies you that he is in fact not sane but was suffering from a mental disease or defect, as I have defined that for you at the time."
The jury had already been sufficiently informed of this point of law, and the supplemental charge merely reiterated the rebuttable nature of this statutory presumption. These instructions are clear and correct statements of the law and the appellant does not contend otherwise.
The appellant argues only that because this requested instruction was given as a supplemental jury charge, its impact was diminished. We disagree. We first emphasize that it was defense counsel's omission failing to add the orally requested instruction to the trial court's written oral charge as instructed by the courtthat caused the trial court to fail to give the specific charge in its primary jury charge. Moreover, we give no credence to the appellant's implication that supplemental jury instructions are inferior to other jury instructions and that a mistrial is the only appropriate remedy where an omission in the trial court's primary jury charge is corrected in a supplemental instruction. These implications fly in the face of well established law in this state. See Peterson v. State, 452 So.2d 1372 (Ala.Cr.App.1984). The appellant's reliance on Bennett v. State, 302 Ark. 179, 789 S.W.2d 436 (Ark.1990), cert. denied, 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990), for the proposition that the timing of the jury instructions in this case denied him a fair trial is misplaced. In Bennett, the trial court charged the jury before the presentation of any evidence, and discussed only a few additional points of law after the defense rested its case.
In this case, as in Peterson,

"[w]e commend the trial judge for taking the time to discuss the objections to this oral charge and for resolving the problems at that stage of the proceeding. This is precisely the procedure recommended by the Alabama Supreme Court in Ex parte Allen, 414 So.2d 993 (Ala.1982), affirming, 414 So.2d 989 (Ala.Cr.App.1981), and in A.R.Crim.Temp. 14 [now Rule 21, Ala. R.Cr.P.] with respect to refused written charges. The result was that the jury was properly informed on the law applicable to the case, including the critical aspects of appellant's claim of self-defense [or, as in the instant case, insanity]...."
Id. at 1376 (bracketed material added). We find no error in the trial court's jury instructions in this regard, or the timing thereof.

XL.
The appellant contends that the trial court's guilt-phase jury charge explaining the use of expert testimony was confusing and misleading. Because the appellant failed to raise this issue at trial, we review this issue under the plain error standard.
The court charged the jury, in pertinent part, as follows:
"Most witnesses are simply allowed to testify as to what they may have seen or heard. But these [expert] witnesses were allowed to express opinions, and I would charge you that you are not required to accept the opinions or conclusions of any of these witnesses, but you must consider thesetheir opinions and that evidence along with all of the other evidence presented on a given issue and through that method reach a decision as to the acceptability or believability of the opinion."
"In making your determination you may reject any or all expert testimony even though it is without conflict. However, opinion testimony, even in the form of experts must be weighed by the jury and may not be arbitrarily ignored."
These are correct statements of the law. See Ellis v. State, 570 So.2d 744 (Ala.Cr.App. 1990). However, the appellant contends that this jury charge was misleading because, he alleges, it implied that a juror could reject expert testimony for no reason at all. Stated another way, the appellant argues that this jury charge allowed the jury to arbitrarily *1334 ignore expert testimony. This strained argument is at odds with the clearly stated language of the jury charge. We find no reasonable likelihood that the jury interpreted the court's instructions as the appellant now argues. We find no plain error here.

XLI.
The appellant contends that the trial court's jury instructions on reasonable doubt violated the Due Process Clause of the United States Constitution, see Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), and the Alabama Constitution. The appellant argues that "[t]he use of the term `moral certainty' in defining reasonable doubt and the notions that a reasonable doubt is a doubt for which a reason can be articulated, are the types of definitions of reasonable doubt that were held to violate the Due Process Clause in Cage." He alleges that, therefore, "[t]he jury could have found [him] guilty on a degree of proof below that required by due process under state and federal law." No objection was raised during trial; therefore, we examine this issue using the plain error standard. Rule 45A, Ala. R.App.P.
The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In this case, the trial court charged the jury on the law regarding reasonable doubt as follows:
"The law places the burden on the State of proving every element of the crime charged and, in order to convict, the jury must be convinced of the defendant's guilt beyond a reasonable doubt and to a moral certainty. The term `reasonable doubt' means what it saysit is a doubt for which a reason can be given based upon a consideration of all of the evidence. A reasonable doubt may arise from all of the evidence, from any part of the evidence or from a lack of evidence. It is not a fanciful, or a vague or imaginary doubt; rather, it is a doubt arising from a fair and impartial consideration of all the evidence and the just and reasonable inferences arising therefrom. If you can say that you have an abiding conviction to a moral certainty of the guilt of the defendant, then you are convinced beyond a reasonable doubt and it would be your duty to convict him. If you cannot say that, then you are not convinced beyond a reasonable doubt and it would be your duty to acquit him."
The appellant argues that this language is unconstitutional because, he says, it is analogous to the jury charge language used in Cage.
In Cage the United States Supreme Court held that the definition of reasonable doubt provided in the jury charge was such that "a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." However, in Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), the Supreme Court expressly overruled the standard applied in Cage. Estelle holds that when reviewing ambiguous jury instructions, an appellate court must determine "`whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution. Boyde v. California, 494 U.S. 370, 380 [110 S.Ct. 1190, 1198, 108 L.Ed.2d 316] (1990)." 502 U.S. at 72, 112 S.Ct. at 482. In a footnote, the Supreme Court explained:
"In Boyde ..., we made it a point to settle on a single standard of review for jury instructionsthe `reasonable likelihood' standardafter considering the many different phrasings that had previously been used by this Court. 494 U.S., at 379-380[, 110 S.Ct. at 1197-1198] (considering and rejecting standards that required examination of either what a reasonable juror `could' have done or `would' have done). So that we may once again speak with one voice on this issue, we now disapprove the standard of review language in Cage and Yates [v. Evatt, 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991)], and reaffirm the standard set out in Boyde."
502 at 73 n. 4, 112 S.Ct. at 482. This court has followed the standard set out in Boyde. See, e.g., Knotts v. State, 686 So.2d 431 (Ala. *1335 Cr.App.1995). The appellant's claim must be examined against this standard.
Much of the appellant's argument concerns the use of the term "moral certainty" in defining reasonable doubt. The Supreme Court in Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), observed that the use of that term in this context is disfavored because it may imply that jurors may base their verdict on factors other than facts that have been demonstrated by the evidence. However, the Court in Victor also stated, "The Constitution does not dictate that any particular form of words be used in advising the jury of the government's burden of proof, so long as `taken as a whole, the instructions correctly conveyed the concept of reasonable doubt.' Holland v. United States, 348 U.S. 121, 140 [75 S.Ct. 127, 138, 99 L.Ed. 150]." 511 U.S. at 22, 114 S.Ct. at 1251. The Court thereby reviewed the jury instruction under attack in the context of the entire charge and held that the inclusion of the "moral certainty" phrase did not render the instruction unconstitutional. 511 U.S. at 22, 114 S.Ct. at 1251.
Thus, we consider whether, in the context of the entire jury charge, the instruction objected to here sufficiently directed the jurors to the evidence in such a manner that there is no reasonable likelihood that they arrived at a finding of guilt based on factors other than the evidence presented in the case. The trial court's jury charge defining reasonable doubt repeatedly emphasized the jury's obligation to base its findings on the evidence introduced at trial. It instructed the jury that a reasonable doubt "is a doubt for which a reason can be given based upon a consideration of all the evidence." It further explained that a reasonable doubt "may arise from all of the evidence, from any part of the evidence or from a lack of evidence," and that "it is a doubt arising from a fair and impartial consideration of all the evidence and the just and reasonable inferences arising therefrom." The trial court's instructions provided a sufficient context to lend meaning to the term "moral certainty" by relating this phrase to a conclusion based only upon a fair and impartial consideration of all of the evidence. Considering the jury charge as a whole and the context in which the term "moral certainty" was used, there is no reasonable likelihood that the jurors applied the instruction concerning reasonable doubt in an improper manner.
Moreover, this jury charge was in substantial compliance with Alabama's pattern jury instructions. The Alabama Supreme Court has held that it is not plain error for the trial court to instruct the jury pursuant to an approved pattern jury instruction. Ex parte Harrell, 470 So.2d 1309 (Ala.1985), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
We further note that, even if we reviewed this issue under the old standard of review used in Cage, it would not be plain error. While the charge in the appellant's case used the term "moral certainty," the use of this term was not sufficient to create a situation analogous with Cage. It was not merely the term "moral certainty" that made the charge in Cage unconstitutional. Rather it was the combined use of "grave uncertainty," "actual substantial doubt," and "moral certainty" that created the constitutional problem. "The use of those terms by the trial court in Cage was the major flaw in that court's jury charge. Gaskins v. McKellar, 500 U.S. 961, 111 S.Ct. 2277, 114 L.Ed.2d 728 (1991) (Stevens, J., concurring specially)." Ex parte Taylor, 666 So.2d 73, 85 (Ala.1995). There was no plain error in the jury charge given in this case.

XLII.
The appellant alleges the trial court erred in allowing the four indictments to go to the jury room in violation of state and federal law. Because no objection was made in the trial court, we examine this issue under the plain error rule.
Rule 21, Ala.R.Cr.P., gives the trial court discretion to send indictments to the jury room in a complex case. Eddins v. State, 501 So.2d 574 (Ala.Cr.App.1986); Thompson v. State, 473 So.2d 1205 (Ala.Cr.App.1985). This was a complex case, involving four indictments. There were two charges of capital murder and two of attempted murder, and numerous lesser included offenses were involved. Additionally, the appellant claimed *1336 the defenses of intoxication and mental disease or defect. The trial court properly charged the jury that the indictments were not evidence and could not be considered as evidence. It is also clear that the trial court's action in sending the indictments to the jury room was done to assist the jury. This issue is without plain error.

XLIII.
The appellant contends that the jury verdict form by which the jury announced his conviction for the capital offense of multiple murder (CC-92-1553) was erroneous and that it violated state and federal law. Specifically he avers that this form was misleading because, he says, it did not inform the jury that, to find the appellant guilty of this capital offense, it must find that the four murders occurred "by one act or pursuant to one scheme or course of conduct," § 13A-5-40(a)(10). He alleges that the omission of this averment from the jury verdict form may have led a reasonable juror to believe that this was not an element of the crime. This issue was not raised at trial. We therefore review it under the plain error standard.
A jury verdict form is an instrument to record the formal decision or finding of the jury. The Alabama Rules of Criminal Procedure give no guidance on the particular contents of a verdict form. Rule 22.1(a) provides only that "[t]he jurors, upon retiring to the jury room for deliberation, shall take with them the applicable forms of the verdict." Therefore, we believe it is appropriate to consider the specific form used in this case and its acceptability for its intended purpose.
Each jury verdict form was numbered with a case number that corresponded to the appropriate indictment. The indictments were also sent into the jury room with the jury verdict forms. The jury verdict form in question corresponded to the indictment in case CC-92-1553, and stated, in pertinent part, as follows:
"With respect to the capital charge alleging the intentional murder of Gerald Paravicini, Freddie Barber, Linda Barber and Bryan Barber, we find the Defendant, Jason Oric Williams: ____ Guilty of the Capital Offense. ____ Not Guilty by Reason of Mental Disease or Defect."
Following these alternatives, was a sentence that read, "If you have found neither of the above, complete the following findings." It then went on to permit selection of one of three options in regard to each of the victims: (1) guilty of murder, (2) guilty of manslaughter, or (3) not guilty. Before charging the jury, the trial court provided each juror with a copy of the jury verdict forms so that he or she could "better follow" the court's charge to the jury. The trial court explained several times in its jury charge the multiple murder capital murder element of "pursuant to one scheme or course of conduct":
"In order for the murdersif indeed the State has proved them to be suchin order for them to constitute a capital offense as regards this indictment the State must prove that they were committed during the coursewell, in the language of the statute, pursuant to one scheme or course of conduct."
"....
"You must find whether the State has proved intentional murder and whether it was done during one course of conduct. If so, it would be your duty to find the defendant guilty of the capital offense. If not, then leaving aside the question of mental disease or defect, you must consider with respect to each alleged victim whether the defendant has been proved to be guilty of murder, of manslaughter, or of nothing at all."
The trial court also referred to the jury verdict forms during its oral charge, as follows: "So you will see on your verdict form if with respect to this indictment you find the defendant guilty of a capital offense, then that's it; you need go no further."
When these facts are considered, we conclude that the jury was well aware that the jury verdict forms were to be considered only in the context of the indictments and the jury charge, both of which clearly set forth all elements of the offenses charged. It is not reasonable to assume that the jury relied on the verdict forms in isolation when determining the elements of the offense. Several factors clearly related each jury verdict form *1337 to a specific indictment and to the jury charge, including: the court's instruction to "follow along" with the court's charge by following the verdict forms; the court's instruction on the multiple murder element; the number on each form correlating to each indictment; the use of the term "capital charge" on the form in question; and the instructions on the form relating to lesser offenses. Thus, the fact that the phrase "one scheme or course of conduct" was not included on the jury verdict form did not suggest that this was not an element of the capital offense. It was specifically stated as an element in the indictment and several times in the jury charge. The state also explained the elements during its arguments to the jury.
When the jury verdict form in question is examined in relation to all the information available to the jury, the appellant's contention lacks merit. The jury verdict form was clearly acceptable under these circumstances for its intended purpose of delineating the possible findings and recording the formal decision. There is no reasonable likelihood that the jury believed that it could find the appellant guilty of the capital offense of murder wherein two or more persons are murdered by one act or pursuant to one scheme or course of conduct without finding that the murders were committed pursuant to one scheme or course of conduct. There was no plain error here.

XLIV.
The appellant contends that the state's evidence was insufficient to support his convictions. He preserved this issue for review by a motion for judgments of acquittal, which was made at the conclusion of the state's case-in-chief, and in a subsequent motion for a new trial.
In deciding whether there was sufficient evidence to support the jury's verdict and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Cr.App.1984), aff'd, 471 So.2d 493 (Ala.1985); Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state's evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980); McBryar v. State, 368 So.2d 568 (Ala.Cr.App.), cert. denied, 368 So.2d 575 (Ala.1979). See cases collected at 7 Ala.Digest, Criminal Law, at Key No. 1159.3. The action of the trial court in denying a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury at the time the motion was made from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr. App.1983); Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). There is a presumption in favor of a jury verdict and where the trial court declined to grant a motion for new trial, that verdict is strengthened on appeal. Willis v. State. Thus, when the evidence raised questions of fact for the jury and such evidence, if believed, was sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal or a motion for a new trial does not constitute error. Willis v. State; Duncan v. State, 436 So.2d 883 (Ala. Crim.App.1983), cert. denied, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984); McConnell v. State, 429 So.2d 662 (Ala.Cr. App.1983). A conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this court that it was wrong and unjust. Duncan v. State; Johnson v. State, 378 So.2d 1164 (Ala.Cr. App.), cert. quashed, 378 So.2d 1173 (Ala. 1979).
The appellant also contends that the jury's verdicts were contrary to the great weight of the evidence. He contends that because he was suffering from an alleged mental disease or defector what he refers to as a "psychotic episode"at the time of the commission of the offenses charged, he could not have formed the requisite intent for the convictions. He also contends that he could not have formed the requisite intent because of his alleged intoxication. He argues *1338 that the evidence of his insanity and intoxication was so overwhelming that he was entitled to a new trial on all charges. Weight of evidence is a different matter from sufficiency of evidence. The court in Johnson v. State, 555 So.2d 818 (Ala.Cr.App.1989), discussed the legal principles involving weight of evidence as opposed to sufficiency of evidence. See also Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The sufficiency of evidence concerns the question whether "viewing the evidence in the light most favorable to the prosecution, a rational factfinder could have found the defendant guilty beyond a reasonable doubt." Johnson v. State, 555 So.2d at 819 (quoting Tibbs v. Florida, 457 U.S. at 37, 102 S.Ct. at 2215). The weight of the evidence refers to a determination by the trier of fact that a greater amount of credible evidence supports one side of an issue. Tibbs v. Florida; Johnson v. State. "We have repeatedly held that it is not the province of the court to reweigh the evidence presented at trial." Id., 555 So.2d at 820."`[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.'" Harris v. State, 513 So.2d 79, 81 (Ala.Cr.App. 1987) (quoting Byrd v. State, 24 Ala.App. 451, 136 So. 431 (1931)).
As we have previously stated, the facts surrounding the commission of the crimes charged and the appellant's involvement were not in dispute. What was in dispute was the appellant's mental condition at the time of the commission of the offenses charged. He contends that he was not guilty because at the time the acts were committed, he, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts.
While the state bears the burden of proving every element of each offense charged beyond a reasonable doubt, the burden of proving a defense of legal insanity rests upon the accused, and the accused is required to overcome the legal presumption of sanity by clear and convincing evidence. § 13A-3-1; § 15-16-2. The question of whether a defendant was legally insane during the commission of an offense is a question for the jury to decide after it has reviewed all the evidence. Haynes v. State, 644 So.2d 1281 (Ala.Cr.App.), cert. denied, 644 So.2d 1281 (Ala. Cr.App.1994).
The question whether a defendant's intoxication rendered it impossible for the defendant to form a particular mental state is also a question for the jury. See Ex parte Bankhead, 585 So.2d 112, 121 (Ala. 1991). Evidence of intoxication, whether voluntary or involuntary, is admissible when it is relevant to negate an element of the offense charged. § 13A-3-2(a). "Voluntary drunkenness does not excuse crime, yet its excessiveness may produce such a mental condition as to render the intoxicated person incapable of forming a specific intent." Lovett v. State, 491 So.2d 1034, 1039 (Ala.Cr. App.), cert. denied, 491 So.2d 1039 (Ala.1986) (quoting State v. Massey, 20 Ala.App. 56, 58, 100 So. 625, 627 (1924)). The degree of intoxication required to establish that a defendant was incapable of forming an intent to kill is a degree so extreme as to render it impossible for the defendant to form the intent to kill. Ex parte Bankhead, 585 So.2d at 121. The law concerning intoxication resulting from drug use is the same as intoxication resulting from alcohol. Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987).
In this case, the trial court properly instructed the jury on the elements of each offense charged in the indictments, including the lesser included offenses. It also properly instructed the jury on the defense of insanity and the law pertaining to intoxication.
The evidence presented by the parties on the issue of insanity was in sharp conflict. Dr. Brown, the psychiatrist testifying for the appellant, stated that it was his opinion that at the time of the commission of the offenses, the appellant was suffering from a mental disease or defect; that because of that mental disease or defect the appellant was "unable to appreciate the nature and quality or wrongfulness of his acts;" and that the appellant's illness was severe. Dr. McClaren, the forensic psychologist testifying in rebuttal for the state, took issue with Dr. Brown's conclusions. Dr. McClaren testified that, while he believed that the appellant was intoxicated (possibly "very intoxicated") from various *1339 substances at the time the appellant committed the offenses, he believed that the appellant had the ability to appreciate what he was doing. He gave the following reasons for this opinion: the appellant had no prior psychiatric history indicating any severe mental illness; five of the victims were shot twice in the head, throat, or upper chest in a very deliberate manner; the crimes occurred in an ongoing series, i.e., this deliberate manner of executing his victims was repeated at two scenes until the appellant succeeded in obtaining money and a vehicle in which to flee; the appellant exhibited a perception of reality when a neighbor drew a gun on him and he backed down; and the circumstances surrounding his flight from the scene, including his disposal of the murder weapon and a victim's wallet, suggested that he knew what he was doing. The record shows the following:
"Q. [Prosecutor]: And what, sir, is the basis of that opinion, that he was able to appreciate what he was doing?
"A. [Dr. McClaren]: The ones that seem most important to me would be, first of wall, the man does not have a psychiatric history other than being perceived a couple of years ago when he shot himself as having a personality disorder and perhaps an adjustment disorder. He does not have one of the severe mental illnesses such as schizophrenia bipolar disorder, or some kind of severe brain damage that often really do interfere with a person's ability to understand and perceive the world and do the right thing. Getting closer to the time period of the victims here, five of the people that were injured were either shot in the head or near ... the head, like throat and upper chest, shot twice. Not just once but deliberately, in my view, shot twice. This did not happen at just one crime scene. It was an ongoing series of events starting at one home and taking with him from one home a purse or money, attempting to commandeer a car; not being successful at that, continuing on to another home which was invaded. Again, the victims at that home were killed in the manner I describedbeing shot in the head twice. Then to take the keys, to be able to get into a car, to drive away, to flee the scene. These things suggest to me that despite being intoxicated that Jason Williams knew what he was doing at the time.
"....
"Q. If there has been testimony from Mr. Evans, a neighbor of the Paravicinis, that on the morning of the 15th of February he came face to face with the defendant at a distance of 50 to 75 feet, and if Mr. Evans further testified that the defendant was armed and that he was armedhe, Mr. Evansand that he told the defendant, `Jay, don't do it,' and Jay didn't do it, if you assume those facts, sir, what, if any, significance are they to you as an expert in the field of psychology in trying to ascertain the defendant's state of mind on the morning of February the 15th?
"A. Again, backing down from another armed person shows a degree of being able to perceive reality, and it's another piece of the puzzlestone in the mosaic of understanding what happened.
"Q. And if there has been testimony from the defendant's own mouth that he discarded the weapon and Mr. Barber's wallet once he was in Mississippi, if those facts were testified to by the defendant, what, if any, significance is that to you as an expert in the field of psychology in reaching a determination of the defendant's state of mind on the morning of February the 15th, 1992?
"....
"A. In my view, I don't know when these things happened, and they suggest that the time he may have done these things that, again, he was in touch with consensual reality. But the things are true that I mentioned in the beginning, these are the things that are most important to meno history of significant mental illness, the purposefulness of the behavior, the flight, going from one place to anotherif these things are true, this strongly suggests to me that the man understood what he was doing at the time and realized the wrongfulness.
"Q. Based on what the defendant told you, do you have an opinion as to whether *1340 or not he was under the influence of some substance, be it drugs, alcohol or some combination thereof at the time that Mr. Paravicini was killed and the Barbers were killed?
"A. If what he told me was true, then I have little doubt that he was very intoxicated.
"Q. What did he tell you?
"A. Well, he told me that he drank about three quarters of a fifth or a quart of whiskey or spirits; that he took three doses of LSD; that he had smoked more than a hundred dollars' worth of crack cocaine or somewhere in that neighborhood; and had also taken some unknown pill from another person, a patron of Top Gun.
"Q. In your opinion, sir, based on what the defendant told you, is it highly unlikely that Fred Barber, Linda Barber, Bryan Barber and Gerald Paravicini would be dead today if the defendant had not ingested voluntarily whatever substances he chose to intoxicate himself with?
"A. That's my opinion. I believe that the intoxication accounts for most of what happened.
"Q. Based on what the defendant told you, does he have such a belief?
"A. He told me it was four innocent lives for a night of drugs."
The appellant's evidence offered in support of his insanity defense was not overwhelming as he contends and was contradicted by evidence offered by the state. The jury, in finding the appellant guilty of the offenses charged, obviously concluded that he had not proved his defense of insanity by clear and convincing evidence. There is ample evidence in the record to support the jury's conclusion; thus, we see no reason to disturb its verdicts in this regard.
The question whether the appellant was intoxicated, and if so, to what extent, when the crimes were committed was also a question of fact that was in dispute and that was an issue to be decided by the jury. The jury, in reaching its verdicts, obviously rejected the appellant's contention that he was so intoxicated at the time of the commission of the offenses that he could not form the requisite intent required for the convictions. There is ample evidence in the record to support the jury's conclusion.
In addition to Dr. McClaren's testimony as to the appellant's alleged intoxication and its extent, Ellzey testified that while she was talking with the appellant on the telephone on the morning of the killings (possibly during part of his rampage) the appellant sounded "very calm," quiet, normal, and sober. The record also shows the following:
"Q. All right. Did you detect from his demeanor, his voice and the fact that you had been around him so much any suggestion that he was under the influence of drugs or alcohol?
"A. No.
"Q. He was just as calm as he could be?
"A. Right.
"Q. So calm that even after you heard these noises, which may or may not have been shots, he picked the phone up again and continued to talk to you, didn't he?
"A. Yes, he did."
Clair Paravicini testified that at the time of the crimes the appellant acted normal and did not appear to be under the influence of drugs. Jeffery Carr, the son of Clair Paravicini, who knew the appellant and had seen him when he was intoxicated, testified that he appeared normal on the morning of the shootings and did not appear intoxicated. The following additional facts indicate that the appellant was not so intoxicated that he did not know what he was doing at the time or that he was not conscious of the wrongfulness of his acts: the fact that the appellant remembered the reason he called Ellzey on the morning the crimes were committed (to discuss her letting him move back in with her); the fact that he took the purses, wallet and money belonging to the victims and fled the scene in the Barbers' van; that fact that he testified that he was scared when he left Mobile; he threw the rifle, one of the purses, and the wallet away; and the fact that he got someone to register in a motel for him. In regard to the appellant's testimony on cross-examination in the guilt phase that during the shootings, he thought an apparition or "hallucinogenic object" of some kind was after *1341 him, it is noteworthy that he did not tell Ellzey this when he was talking with her on the telephone at the time the crimes were being committed, nor did he advance such an idea to her when he talked with her on the telephone on the day after the shootings or to the investigators when they questioned him on the day after the crimes were committed. His story about the apparition surfaced for the first time during his pretrial interview with Dr. Brown. It is our opinion that a close examination of the appellant's testimony, particularly his answers on cross-examination, would lead a reasonable trier of fact to question the appellant's veracity.
In conclusion, after examining the evidence and applying the proper standards of review, we hold that the state presented sufficient legal evidence from which the jury by fair inference could conclude beyond a reasonable doubt that the appellant was guilty of the crimes charged in the indictments. Moreover, while we do not intend to reweigh the evidence, we note that in the instant case, the weight of the evidence was clearly not with the appellant. Accordingly, the appellant's motions for judgments of acquittal and for a new trial based on the assertions of insufficiency of the evidence were properly denied.

XLV.
The appellant contends that, in its jury instructions in the penalty phase of the trial, the trial court erred by failing to define the phrase "knowingly created a great risk of death to many persons," as that phrase applies to the aggravating circumstance set out in § 13A-5-49(3). Because the appellant did not raise this issue before the trial court, our review is under the plain error rule.
The phrase at issue has not been defined by statute or by case law. "When a term is included in a statute relevant to a case, and that term is not defined by statute, whether it is necessary for the trial court to define the term for the jury hinges on the facts of the case. See Thornton v. State, 570 So.2d 762 (Ala.Cr.App.1990)." Ivery v. State, 686 So.2d 495 (Ala.Cr.App.1996). This principle "has added meaning when the challenged terms can be understood by the average juror in their common usage." Thornton, 570 So.2d at 772. In this case, the intended meaning of the phrase at issue is clear on its face. This phrase is written in plain English and contains no terms of art or legal jargon. We fail to see any way in which a labored definition of this phrase would have clarified its meaning. Our conclusion is buttressed by the fact that, unlike the appellants in Ivery and Thornton, the appellant here has failed to present any conceivable confusion, based on the facts of this case, that may have resulted from the use of this phrase alone without definition. Moreover, the trial court's jury charge regarding this aggravating circumstance followed the pertinent pattern jury instruction in Proposed Pattern Jury Instructions for use in the Sentence Phase of Capital Cases Tried under Act No. 81-178. That pattern jury instruction provides no definition for the phrase at issue. "`"[W]e do not think we should hold that the trial judge plainly erred when he instructed the jury pursuant to a pattern jury instruction `recommended' by this Court, especially in the absence of an objection or request from the defendant."' Kuenzel [v. State], 577 So.2d [474], 520, [(Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)], quoting Ex parte Harrell, 470 So.2d 1309, 1315 [(Ala.1985)]." Williams v. State, 601 So.2d 1062 (Ala.Cr.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992) (emphasis in original). We find no plain error here.
In his brief to this court, the appellant argues that the trial court intended to define this phrase for the jury, which he argues is evidenced by the fact that, during the discussion of this aggravating circumstance, the court stated "as I have defined that term to you." The appellant's contention appears to misrepresent the record. The quoted passage, taken in its proper context, appears in the record, as follows: "The burden is on the state to prove beyond a reasonable doubt, as I defined that term to you, the existence of that circumstance." (Emphasis added.) Clearly, the underscored passage refers to the term "reasonable doubt"not, as the appellant contends, the phrase at issue here.

*1342 XLVI.
The appellant contends that the use of the two aggravating circumstances(1) that he knowingly created a great risk of death to many persons, and (2) that the capital murders were committed during the course of a robberyresulted in the arbitrary imposition of the death penalty because, he says, the "`application of double-counting' does not serve to distinguish Mr. Williams' case from any other multiple-intentional-murder case in the State." The issue of "double-counting" or "overlapping" has been decided adversely to the appellant. See Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994); Burton v. State, 651 So.2d 641, 657-58 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995); Kuenzel, 577 So.2d at 486-88.

XLVII.
The appellant contends that the trial court erred in the penalty phase of the trial when it failed to instruct the jury that it had the option to recommend that the appellant be sentenced to life imprisonment without the possibility of parole even if it did not believe that the mitigating circumstances outweighed the aggravating circumstances or even if it found that no mitigating circumstances existed. No objection was raised at trial to the failure of the trial court to give such an instruction to the jury; thus, we review the issue under the plain error rule.
The United States Supreme Court in Boyde v. California, 494 U.S. 370, 377, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990), addressed this issue as follows:
"Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances `outweigh' the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence `in an effort to achieve a more rational and equitable administration of the death penalty.' Franklin v. Lynaugh, 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988) (plurality opinion)."
We have rejected arguments in prior capital cases that the defendant is entitled to a jury instruction that the jury has unbridled discretion to recommend a sentence of life imprisonment without the possibility of parole regardless of the evidence pertaining to aggravating and mitigating circumstances. See, e.g., Smith v. State, 581 So.2d 497 (Ala. Cr.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Morrison v. State, 500 So.2d 36 (Ala. Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). In Williams v. State, supra, 601 So.2d 1062, 1081, we stated as follows:
"The appellant next argues that the trial court erred in failing to instruct the jury on `their unfettered option' to impose a sentence of life without parole. The jury may not recommend mercy without reason. See Morrison v. State, 500 So.2d 36 (Ala. Cr.App.1985), aff'd, 500 So.2d 57 (Ala. 1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). The jury does not have an `unfettered option' to recommend a sentence of life without parole unless after weighing the aggravating and mitigating circumstances it finds that life without parole is warranted."
We find no merit in the appellant's contention that he was entitled to a jury instruction that the jury had an unfettered option to return a recommendation of life imprisonment without the possibility of parole regardless of "its calculus as to aggravators and mitigators." Kuenzel v. State, 577 So.2d at 520. No error was committed here, much less plain error.

XLVIII.
The appellant contends that Alabama's capital punishment statute is constitutionally flawed because, he argues, it does not provide any guidance to the trial court on the weight the court should give the jury's sentence recommendation when determining a defendant's sentence and that, therefore, *1343 the trial court's discretion in sentencing is without guidance. "Numerous decisions by this court, as well as the United States Supreme Court, have expressly rejected this argument. Crowe v. State, 485 So.2d 351 at 364-365 [(Ala.Cr.App.1984), rev'd on other grounds, 485 So.2d 373 (Ala.1985)]; Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)." Williams v. State, 556 So.2d 737, 741 (Ala.Cr. App.1986), aff'd in part, rev'd in part on other grounds, 556 So.2d 744 (Ala.1987).
The appellant questions whether the trial court considered the jury's sentence recommendation as an aggravating circumstance. Clearly, it did not. The trial court specifically set out in its sentencing order the aggravating circumstances it considered: (1) that the appellant knowingly created a great risk of death to many persons, and (2) that the capital murders were committed during the course of a robbery.

XLIX.
The appellant contends that the trial court allegedly sentenced him to death for an improper reason: the "magnitude or consequence" of the crimes committed. He argues that the trial court erred in allegedly focusing solely on the crimes themselves and ignoring the circumstances surrounding the crimes, the evidence in mitigation, and the character of the appellant. It appears that the appellant is complaining that, as allegedly evidenced by the trial court's failure to read into the record before to pronouncing sentence the factors it relied upon in sentencing the appellant to death and the weight given to those factors, the court abandoned its duty to consider those factors and arbitrarily sentenced the appellant to death based upon "an improper reason." He claims that he was denied an "individualized" determination of his sentence, as allegedly evidenced by the following comment made by the trial court when at the conclusion of the sentencing hearing it pronounced sentence:
"The legislature and the people of this State had to have something in mind when they enacted the statute providing for the death penalty, and if a crime of this consequence isn't that, I do not know what is. I sentence you to death in the manner provided by law."
We find no merit to these contentions. First, there is absolutely nothing in the record to support the appellant's assertion that the trial court focused solely on the crimes themselves and ignored the circumstances surrounding the crime, the evidence in mitigation, or the character of the appellant. To the contrary, before pronouncing sentence, the trial court had received the jury's sentence recommendation, had ordered and had received the presentence report, and had heard testimony regarding aggravating and mitigating circumstances. Second, the trial court entered its written order on the same day it sentenced the appellant. The written order reflects that the trial court complied with the requirements of § 13A-5-47 in determining the appellant's sentence. Finally, when the sentencing hearing as a whole is considered, the record refutes the appellant's contention that the quoted statement by the trial court suggests that it did not sentence him in accordance with the statutory requirements. Moreover, elsewhere in his brief in this court, the appellant concedes that the trial court weighed the aggravating circumstances against the mitigating circumstances. (See part LI, infra.)

L.
The appellant contends that the trial court erred by relying on a presentence investigation report that contained impermissible and inaccurate hearsay. He argues that the report contained unreliable, unconfronted, and inadmissible hearsay: three criminal charges that were dismissed or not prosecuted, unsubstantiated driving violations, and an allegation of a robbery in Oregon for which he was never extradited. This issue was not raised at trial.[11] Therefore, we review it under the plain error standard.
*1344 Section 13A-5-47(b) provides for the use of a presentence investigation report:
"Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case."
Section 13A-5-45(d) addresses the evidence to be used at the sentencing hearing:
"Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama."
Rule 26.3, Ala.R.Crim.P., prescribes the contents of the presentence investigation report. Among other things, it may contain "[a] statement of the defendant's prior criminal and juvenile record, if any." In construing this rule, this court has determined,
"It is clear that the inclusion of charges that did not result in convictions is proper because the Rule allows for juvenile charges to be included. It is well settled that juvenile charges, even those that result in an adjudication of guilt, are not convictions and may not be used to enhance punishment."
Thompson v. State, 503 So.2d 871 (Ala.Crim. App.1986), aff'd, 503 So.2d 887 (Ala.), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987). Because the information the appellant complains of had probative value and is of the type prescribed by the Alabama Rules of Criminal Procedure, it was not error, much less plain error, for the presentence report to reflect any charges against the appellant that were dismissed, unsubstantiated, or not prosecuted. The trial court also accurately interpreted this information when it found in its sentencing order, "Defendant has no significant history of prior criminal activity." and "While the presentence investigation indicates that Defendant is no stranger to violence or criminal activity, it is true that he has no prior convictions."
The appellant's argument that the report was improper hearsay evidence is without merit. This court has already determined that "the [presentence investigation] report itself is an out-of-court statement and is entirely hearsay. However, it is admissible under § 13A-5-47 Code of Alabama, being specifically called for consideration by the trial court." Thompson, 503 So.2d at 880.
There is no plain error.

LI.
The appellant contends that the trial court's sentencing order is constitutionally deficient. In support of this contention, he argues that the trial court failed to give adequate consideration to the statutory and nonstatutory mitigating circumstances he presented, that it failed to properly weigh the mitigating circumstances against the aggravating circumstances, and that it incorrectly concluded that the aggravating circumstances outweighed the mitigating circumstances. He specifically argues that because the evidence allegedly established that he was intoxicated at the time of the commission of the offenses, the trial court erred in failing to find the statutory mitigating circumstance "that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired," § 13A-5-51(6). These contentions were raised in the trial court in the appellant's motion for a new trial.
At the sentencing phase of the trial before the jury, the state introduced all the evidence adduced at the guilt phase, and rested. The *1345 appellant then put on a brief case during which his mother, Patricia Neal, and his former wife, Sandra Ellzey, testified and at which he testified in his own behalf. Neal testified about the appellant's background and family life. She stated that the appellant was 23 years of age at the time of the commission of the offenses, that his father had abandoned her and the appellant when the appellant was 7 months old, that he had been adopted by her sister, that she had little contact with him over the years, that he did not learn that she was his mother until he was 18 years of age, and that she had served time in prison for possession of drugs and shoplifting. She blamed herself for the appellant's troubles because, as she stated, she had not been a proper mother to him. Ellzey testified that there was "good" in the appellant, that he had been good to her and to her son, and that he had a drug problem. The appellant testified that he was sorry for the people that he had hurt.
After hearing the evidence and the arguments of the parties, which included arguments urging the finding of certain aggravating and mitigating circumstances, the trial court correctly instructed the jury on its function and on the relevant law applicable to the sentencing phase. It instructed the jury that the state relied upon two aggravating circumstances: that the capital offense was committed while the appellant was engaged in the commission or an attempt to commit the crime of robbery, § 13A-5-45(4), and that the appellant knowingly created a great risk of death to many persons, § 13A-5-45(3). It advised the jury that the burden was on the state to prove the aggravating circumstances beyond a reasonable doubt. See § 13A-5-49(e). It also properly instructed the jury that the aggravating circumstance enumerated in § 13A-5-45(4) that the capital offense was committed during the commission or attempt to commit a robberyhad been proven beyond a reasonable doubt at the guilt phase by virtue of the jury's guilty verdict on the murder-robbery indictment and should be considered as having been proven beyond a reasonable doubt for purposes of the sentencing hearing. See § 13A-5-50. The trial court instructed the jury that the appellant had offered four statutory mitigating circumstances for its consideration: that the appellant had no significant history of prior criminal activity, § 13A-5-51(1); that the capital offenses were committed while the appellant was under the influence of extreme mental and emotional disturbance, § 13A-5-51(2); that the capacity of the appellant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, § 13A-5-51(6); and that the appellant was 23 years old at the time of the commission of the crimes, § 13A-5-51(7). The trial court further instructed the jury that it could consider in mitigation any other circumstance existing or advanced in mitigation in the guilt or sentencing phases of the trial. See § 13A-5-52. The court correctly instructed the jury on the burden of proof as to mitigating circumstances. See § 13A-5-45(g). It instructed it that to the extent that the factual existence of any of the mitigating circumstances was in dispute, the burden would be on the state to disprove such circumstance or circumstances by a preponderance of the evidence. After being further properly instructed as to its responsibilities in weighing the aggravating circumstances against the mitigating circumstances and in rendering an advisory verdict recommending a sentence, the jury returned a verdict recommending a sentence of death by a vote of 10 to 2.
At the sentencing phase of the trial that took place before the trial court only, the state offered no additional evidence, but urged the trial court to consider the two aggravating circumstances presented and the advisory verdict of the jury and to sentence the appellant to death. The appellant's attorney, in addition to arguing the existence of the four statutory mitigating circumstances listed above, read the following statement from the appellant into the record:
"I am asking this Court to spare my life and give me life without parole. I don't remember what happened on the morning of this crime. I am so very sorry for what happened. Linda, Freddie, Gerald, Jeffery and Brad were my friends and I would never in my right mind do anything to hurt any of them. I know if it wasn't *1346 for the drugs and alcohol this would not have happened. I have lived around these people all my life. I cannot express my sorrow enough to the families. I hope that some day they can forgive me. I wish there was something I could do or say to ease their pain. I also will have to live with this pain for the rest of my life. Again, I ask this Court to sentence me to life without parole. I did not intend to hurt anyone that day, and I wasn't in my right mind."
The appellant personally addressed the court, stating, "Judge, I am sorry for what I did. I am sorry. I wish there was something I could do. I am asking y'all to spare my life. I don't want to die."
Upon conclusion of the hearing, the trial court sentenced the appellant to death and filed a detailed sentencing order. The sentencing order shows that the trial court found two aggravating circumstances: that the capital offense was committed while the appellant was engaged in the commission of a robbery and that the appellant created a great risk of death to many persons. The trial court specifically found that these two aggravating circumstances had been proven beyond a reasonable doubt. In reference to the first aggravating circumstance, the trial court found that the appellant killed Freddie Barber and Linda Barber while he was engaged in robbing them of their vehicle. In reference to the second aggravating circumstance, it found that the appellant shot and killed four persons, shot and wounded two others, shot at and missed another, and beat Clair Paravicini with a rifle. The findings by the trial court of the existence of the aggravating circumstances listed above are fully supported by the record.
The trial court found the existence of three statutory mitigating circumstances: that the appellant had no significant history of prior criminal activity, that he was under the influence of extreme mental or emotional disturbance at the time of the commission of the offenses, and that he was 23 years of age at the time of the commission of the offenses. In finding the existence of these statutory mitigating circumstances, the trial court found that they had been injected into the proceedings by the appellant and that the state had not disproved their existence. In reference to the first mitigating circumstance listed above, the trial court found that even though the presentence investigation report disclosed that the appellant was no stranger to violence and criminal activity, he did not have any prior convictions. In reference to the second mitigating circumstance listed above, the trial court stated in its sentencing order that the appellant claimed that he was emotionally disturbed due to a conflict with Ellzey and that he was mentally disturbed because of the drugs he had taken. In finding the existence of the third mitigating circumstance listed above, the trial court found that the appellant was 23 years of age at the time of the commission of the offenses. The trial court found the existence of one nonstatutory mitigating circumstance: that the appellant had suffered from a "deprived" childhood, including "abandonment by his natural mother and the representation to him that his aunt was his mother." The findings by the trial court of the existence of the mitigating circumstances listed above are fully supported by the evidence in the record.
The trial court found in reference to the statutory mitigating circumstance of § 13A-5-51(6)that the "capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired," which had been injected into the proceedings at the penalty phase by the appellant, was disproved by the state by a preponderance of the evidence.
Voluntary intoxication will not constitute the mitigating circumstance that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, where the defendant did not show that he was so intoxicated as to render himself incapable of appreciating the criminality of his conduct. Kuenzel v. State, 577 So.2d 474, 522 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). While the evidence of intoxication in this case is in dispute, there was ample evidence from which the trial court could find that the *1347 appellant was not so intoxicated as to substantially impair his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. See our discussion of the pertinent facts in part XLIV of this opinion. We find no error in the trial court's finding that the mitigating circumstance in question was disproved by a preponderance of the evidence.
The trial court states in its sentencing order that it weighed the aggravating and mitigating circumstances and that it found "beyond a reasonable doubt" that the aggravating circumstances outweighed the mitigating circumstances. A sentencer in a capital case may not refuse to consider or be "precluded from considering" mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973, (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, 627 So.2d 874 (Ala. 1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So. 2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987).
We conclude, contrary to the appellant's contentions, that the trial court fully considered the statutory and nonstatutory mitigating circumstances offered. The record supports the conclusion that the trial court properly weighed the aggravating circumstances against the mitigating circumstances, and likewise supports the trial court's finding that the aggravating circumstances outweighed the mitigating circumstances. The trial court's sentencing order was not constitutionally deficient as the appellant contends, but, on the contrary, met all legal requirements. The denial of the appellant's motion for a new trial on the grounds asserted was proper.
The cases relied upon by the appellant Parker v. Dugger 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991); Magwood v. Smith, 791 F.2d 1438 (11th Cir.1986); Hadley v. State, 575 So.2d 145 (Ala.Cr.App.1990)are factually distinguishable from this case.

LII.
The appellant contends that the cumulative effect of all the errors allegedly committed in the trial of his case violated his right to due process and his right to a fair trial. We do not agree. We have reviewed each and every allegation of error as well as the cumulative effect of such alleged errors and find that the cumulative effect of these alleged errors does not call for a reversal.

LIII.
In accordance with Ala.R.App.P. 45A, we have examined the record for any plain error, whether or not brought to our attention or the attention of the trial court. We find no "plain error or defect in the proceedings," either in the guilt phase or in the sentence phases of the trial.
We have also reviewed appellant's sentence in accordance with the provisions of § 13A-5-53. Section 13A-5-53(a) requires that, in addition to reviewing the case for any error involving the conviction, we shall also review the propriety of the death sentence. This review shall include our determination *1348 of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by us of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted the appellant of the capital offenses charged in the indictments, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46. After hearing evidence concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury returned the following verdict: "We find that the appropriate punishment is death. The vote is ten, death; and two, life without parole."
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, to aid it in determining whether it would sentence the appellant to death as recommended by the jury or to life imprisonment without the possibility of parole. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any mitigating circumstance found to exist under § 13A-5-52, as well as written findings of fact summarizing the crimes and the appellant's participation in them. For a discussion of the trial court's findings in reference to the aggravating and mitigating circumstances, see part LI of this opinion.
In its findings of fact, the trial court found the existence of the following aggravating circumstances: (1) that the capital offense was committed while the defendant was engaged in the commission of or in an attempt to commit, or in flight after committing, or in attempting to commit robbery, § 13A-5-49(4), and (2) that the defendant knowingly created a great risk of death to many persons. § 13A-5-49(3).[12] The trial court examined the evidence for statutory mitigating circumstances, pursuant to § 13A-5-51, and found the existence of three: (1) that the appellant has no significant history of prior criminal activity, § 13A-5-51(1); (2) that the capital offenses were committed while the appellant was under the influence of extreme mental or emotional disturbance, § 13A-5-51(2); and, (3) that the appellant was 23 years of age when he committed the offenses charged in the indictments, § 13A-5-51(7). The trial court examined the evidence for nonstatutory mitigating circumstances, pursuant to the requirements of § 13A-5-52, and found the existence of one: that the appellant "had a deprived childhood, including his abandonment by his natural mother and the representation to him that his aunt was his mother." The sentencing order reflects that the trial court considered all of the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury; that the trial court weighed the aggravating circumstances against the mitigating circumstances; and, *1349 that, finding that the aggravating circumstances outweighed the mitigating circumstances, the trial court sentenced the appellant to death.
The appellant was convicted of the offenses of murder committed during a robbery in the first degree, or an attempt thereof, a capital offense, § 13A-5-40(a)(2), and murder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct, § 13A-5-40(10). These offenses are defined by statute as capital offenses. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Kuenzel v. State, 577 So.2d 474 (Ala.Cr. App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) (murder-robbery); Siebert v. State, 555 So.2d 772 (Ala.Cr.App.), aff'd, 555 So.2d 780 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990) (multiple murders by one act, scheme, or course of conduct); Holladay v. State, 549 So.2d 122 (Ala.Cr.App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989) (multiple murders by one act, scheme, or course of conduct); Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989) (murder-robbery); Peoples v. State, 510 So.2d 554 (Ala.Cr.App.1986), aff'd, 510 So.2d 574 (Ala.), cert. denied, 484 U.S. 933, 108 S.Ct. 307, 98 L.Ed.2d 266 (1987) (multiple murders by one act, scheme, or course of conduct); Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.1984), aff'd, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985) (murder-robbery).
After carefully reviewing the record of the guilt and the sentence phases of appellant's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We concur in the recommendation of the jury and in the judgment of the trial court that death is the appropriate sentence in this case. We have independently weighed the aggravating circumstances against the mitigating circumstances, and we find that the aggravating circumstances clearly outweigh the mitigating circumstances, and we are convinced that the sentence of death is appropriate in relation to this defendant. Considering the crimes committed and the defendant, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, the appellant's convictions and the sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.

On Application for Rehearing
PATTERSON, Judge.
The appellant, Jason Oric Williams, filed an application for rehearing, with supporting brief, on September 6, 1996. He raises no new issues in his application. He raises only two issuesalleged prosecutorial misconduct by abuse of the grand jury process and alleged improper trial court instructions to the jury regarding its consideration of nonstatutory mitigating circumstances in the penalty phase of the trialand we fully considered and addressed these issues in our opinion of August 23, 1996, affirming the convictions and sentences.
In considering the appellant's application for rehearing, we have reviewed our August 23, 1996, opinion and decision of affirmance, not only as to the two issues raised in his application for rehearing, but as to all issues previously raised on appeal, and we considered the appellant's brief filed in support of his application. We are not persuaded to alter our original holding affirming the appellant's convictions and sentences. The application for rehearing is due to be, and it is hereby, overruled.
OPINION EXTENDED; APPLICATION OVERRULED.
All Judges concur.
NOTES
[1] The pertinent portion of the indictment reads as follows:

"The Grand Jury of said County charged, that... Jason Oric Williams ... did, in the course of committing the theft of a 1991 Ford Aerostar van, the property of Freddie Barber and Linda Barber, use force against the persons of Freddie Barber and Linda Barber, with the intent to overcome their physical resistance or power of resistance and in so doing, [did] cause serious physical injury to Freddie Barber and Linda Barber by shooting them with a gun, in violation of 13A-8-41 of the Code of Alabama.
"During the aforesaid robbery in the first degree, the said Jason Oric Williams did, with the intent to cause the deaths of Freddie Barber and Linda Barber, cause the deaths of Freddie Barber and Linda Barber, by shooting them with a gun, in violation of 13A-5-40(a)(2) of the Code of Alabama."
[2] The pertinent portion of the indictment reads as follows:

"The Grand Jury of said County charged, that... Jason Oric Williams ... did, with the intent to cause the deaths of Gerald Paravicini, Freddie Barber, Linda Barber, and Bryan Barber, cause the deaths of Gerald Paravicini, Freddie Barber, Linda Barber, and Bryan Barber, by shooting them with a gun, pursuant to one scheme or course of conduct, in violation of 13A-5-40(10) of the Code of Alabama."
[3] The pertinent portion of the indictment reads as follows:

"The Grand Jury of said County charged, that... Jason Oric Williams ... did, with the intent to commit the crime of murder, a violation of 13A-6-2 of the Code of Alabama, attempt to commit said offense by shooting Jeffery Carr with a gun, in violation of 13A-4-2 of the Code of Alabama."
[4] The pertinent portion of the indictment reads as follows:

"The Grand Jury of said County charged, that... Jason Oric Williams ... did, with the intent to commit the crime of murder, a violation of 13A-6-2 of the Code of Alabama, attempt to commit said offense by shooting Brad Barber with a gun, in violation of 13A-4-2 of the Code of Alabama."
[5] The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors. Ala.Code 1975, § 13A-5-46(f).
[*] Note from the reporter of decisions: The record indicates that when this witness was asked to spell his name he answered: "B-i-l-l-e-d-e-a-u-a." However, the record contains other spellings of his name.
[6] At arraignment, the appellant pleaded not guilty to all charges and reserved the right to file additional pleas within 20 days. The record shows that, immediately before the trial, the trial court gave defense counsel leave to file an insanity plea and announced that it was proceeding on the premise that a defense of insanity had been asserted. (R. 210.) We note that during the trial the appellant relied principally on an insanity defense; however, we do not find a special insanity plea in the record as required by § 15-16-1. In the absence of such a formal plea, the question of insanity would not be properly before the jury and any evidence going to prove insanity would be inadmissible on proper objection. Bowen v. State, 386 So.2d 489 (Ala.Cr.App.1980). Nevertheless, the trial was conducted in every respect as if a special plea of insanity had been filed. No objection was raised by the parties to the admission of evidence bearing on the issue of insanity, which was offered by both the state and the appellant. The parties argued the issue to the jury, the trial court charged the jury on the issue, and the issue was submitted to the jury for its decision. For example, as part of its charge the court stated, "You also have to consider the defendant's defense of not guilty by reason of mental disease or defect." Although the record does not show a formal insanity plea, we think the record supports an inference that such a plea was made. "The right to plead an additional plea after arraignment is not absolute, but a matter addressed to the sound discretion of the court, and its action is not revisable on appeal." Id. at 491 (quoting Goodman v. State, 15 Ala.App. 161, 72 So. 687 (1916)). Assuming for the sake of argument that no special plea of insanity was filed, we still believe the insanity defense in this case is properly before us for consideration. Treatment of issues not raised by pleadings but tried by express or implied consent of the parties as if they had been raised in pleadings include those affirmative defenses raised by evidence admitted at trial without objection. Cf. Rhyne v. H. & B. Motors, 505 So.2d 307 (Ala.1987); Ala. R.Civ.P. 15(b).
[7] In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term "plain error" adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Plain error is error that "has or probably has adversely affected a substantial right of the appellant," Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack. The failure to object at trial weighs against any claim of prejudice an appellant may make. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala. 1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
[8] We note that Rule 11, Ala.R.Crim.P., has recently been substantially amended and that the amendment is effective October 1, 1996. We quote below the rule in effect at the time of the trial and of this opinion. The changes made in the paragraphs that are quoted from are not substantive.
[9] "After finding error, an appellate court may still affirm a conviction on the ground that the error was harmless, if indeed it was. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Sattari v. State, 577 So.2d 535 (Ala.Cr.App.1990), cert. denied, 577 So.2d 540 (Ala.1991); A.R.App.P. 45. The harmless error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983); Henderson v. State, 583 So.2d 276 (Ala.Cr.App. 1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Musgrove v. State, 519 So.2d 565 (Ala.Cr.App.), aff'd, 519 So.2d 586 (Ala.1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988).... In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, the state must establish that the error did not or probably did not injuriously affect the appellant's substantial rights."

Guthrie v. State, 616 So.2d 914, 931 (Ala.Cr.App. 1993).
[10] In his brief to this court, Williams misstates this principle of law, without citation to any legal authority, as follows: "It is well settled that evidence offered to prove a defendant's state of mind is not hearsay and therefore may be admitted at trial for the truth of the matter asserted." (Emphasis added.) The emphasized text tracks the following definition of hearsay: "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801, Ala.R.Evid. Thus, Williams appears to argue that state of mind evidence is at once not hearsay, and at the same time, is hearsay that is admissible under an exception to the general exclusionary rule.
[11] The appellant had the report and the opportunity to rebut any assertion in it or object to it. The sentencing order states, "The State and the Defendant were offered the right to present evidence concerning the presentence report or otherwise, and declined to do so."
[12] We note that in other capital cases involving facts similar to those in this case, this aggravating circumstance was proven to exist and was properly considered in the decision to impose the death penalty. See, e.g., Edwards v. State, 515 So.2d 86 (Ala.Cr.App.1987); Crawford v. State, 377 So.2d 145 (Ala.Cr.App.), aff'd, 377 So.2d 159 (Ala.1979), vacated on other grounds, 448 U.S. 904, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (1980). Williams does not contend that this aggravating circumstance was not proven.